**MILTON S. KRONHEIM & CO., INC., Plaintiff,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**Civ. A. No. 95–0226–LFO.**

United States District Court, District of Columbia.

Feb. 24, 1995.

Mark D. Hopson, Bradford A. Berenson, Sidley & Austin, Washington, DC, for plaintiff.

Garland Pinkston, Jr., Acting Corp. Counsel, D.C., Martin L. Grossman, Deputy Corp. Counsel, D.C. Civ. Div., William J. Earl, Chief, Major Case Section, James C. McKay, Jr., Jack M. Simmons, III, Asst. Corp. Counsel, D.C., Office of Corp. Counsel, Washington, DC, for defendants.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiff, an alcoholic beverage wholesaler licensed in the District of Columbia, seeks a preliminary injunction against defendants to prevent enforcement of a provision of the District of Columbia Wholesale Liquor Industry Storage Act of 1986 (the "Storage Act") and a "come to rest" policy, both of which require plaintiff to maintain warehouse facilities in the District of Columbia. Plaintiff argues that any local warehousing requirement violates the Commerce Clause. After an evidentiary hearing on the motion on February 10, 1995, a ruling from the bench granted plaintiff's motion for reasons there stated and to be further elaborated by a Memorandum to be filed. This is that Memorandum.

### I.

Plaintiff Milton S. Kronheim & Co., Inc. is a District of Columbia corporation, licensed by the D.C. Alcoholic Beverage Control Board to do business as an alcoholic beverage wholesaler. Margolies Aff. dated January 31, 1995, at ¶ 1. Kronheim distributes alcoholic beverages to retailers in the District. Its approximately 80 suppliers are brewers, wineries, and major distillers of liquor. Id. ¶ 4. Kronheim also has an affiliate, The Kronheim Company, Inc., a corporation organized and existing under the laws of the state of Maryland, with its principal place of business in Baltimore, Maryland. The Kronheim Company, Inc. is a wholesale distributor of alcoholic beverages in Maryland. Id. ¶ 5.

Presently, Kronheim (D.C.) and Kronheim (Md.) have separate warehouse facilities. Kronheim (D.C.) leases space in two contiguous warehouses in northeast Washington, D.C. The larger warehouse, located at 2900 V Street, N.E., contains approximately 40,000 square feet of warehouse space and 17,000 square feet of office space. The warehouse has two loading docks, both of which face a narrow street. The warehouse ceiling is 18 feet high and is supported by closely spaced floor-to-ceiling pillars throughout the warehouse. Plaintiff states that 18-wheel trailers have difficulty accessing the loading docks because the docks face a narrow street and that the pillars and low ceiling render a portion of the floor space unusable. Plaintiff further asserts that the smaller warehouse, with 22,500 square feet of floor space, has similar problems. Kronheim's leases on the two warehouses expire on March 31, 1995 and February 28, 1995 respectively.

Until January 31, 1995, Kronheim (D.C.) leased a third warehouse at 2920 V Street, N.E, with approximately 20,000 square feet of floor space. The lessor sold the warehouse, and the new owner took possession of it for its own use upon the expiration of the lease on January 31, 1995. Id. ¶ 6.

Kronheim (D.C.) wishes to consolidate its warehousing with its Maryland affiliate. Kronheim asserts that in order to consolidate the two firms' warehousing into a single storage facility, it needs 200,000 square feet of warehouse storage space, of which 10–20% must be refrigerated storage, with an adjoining 20,000 to 40,000 square feet of office space. It further seeks a warehouse with 24-foot-high clear ceilings, at least eight truck loading bays, adequate parking for its office and warehouse personnel, and a location near the center of the combined area served by both Kronheim (D.C.) and Kronheim (Md.) with ready access to I–95 and other major transportation arteries. Larson Aff. ¶ 5.

Kronheim (D.C.) projects that it will lose money in 1995 unless it is able to reduce costs or increase revenues. Margolies Aff. dated January 31, 1995, at ¶ 14. It asserts

that due to the nature of the alcoholic beverage wholesale industry, it may go out of business permanently unless it restores itself to profitability, and that the only way to restore itself to profitability is to consolidate its D.C. warehouses with those of its Maryland affiliate. *Id.* ¶¶ 8–13, 15–18.

To this end, plaintiff seeks to acquire a warehouse in Jessup, Maryland. The Jessup warehouse purportedly has enough space for consolidated operations, sufficiently high ceilings, few support pillars, and loading docks with an access area that can accommodate 18–wheel trailers. Plaintiff asserts that the Jessup warehouse's combination of features (location, size, space configuration, features and access) makes it unique in the Washington–Baltimore area. *Id.* ¶¶ 22–23. Plaintiff claims that if it is unable to move to the Jessup facility, it will be forced to go out of business. *Id.* ¶ 31; Mollerick Aff. ¶ 10.

Plaintiff has a "handshake" agreement to purchase the Jessup warehouse, and the present owner tendered a written contract on January 27, 1995. Margolies Aff. dated January 31, 1995, at ¶ 24. Plaintiff has introduced uncontradicted evidence that the seller must close the transaction involving the Jessup facility on or before March 14, 1995, and that due to the complexity of the transaction, it must sign the purchase contracts "in the next few days ... or the seller will sell the Jessup facility to another buyer." Margolies Aff. dated February 10, 1995, at ¶ 8.

If plaintiff were to move its warehousing operations to the Jessup, Maryland facility, it would remain a District of Columbia corporation, and it asserts that the efficiencies from consolidation with its Maryland affiliate may lead to greater revenues, resulting in more corporate income tax to the District. Approximately ninety percent of the total taxes plaintiff pays to the District are excise taxes imposed upon the sale of alcoholic beverages to District retailers and would be unaffected by the location of Kronheim's warehouse. Twenty-two of Kronheim's 84 employees are District residents and pay income tax to the District. Plaintiff predicts that its license fees and the sales tax it remits would remain constant. Because Kronheim presently leases warehouse space in the District, its landlords are responsible for related property tax irrespective of whether plaintiff remains their tenant. Mollerick Aff. ¶ 9.

On September 28, 1993, the Board granted an exemption from the local warehousing requirement to American Potomac Distributing Company, a liquor wholesaler and competitor of Kronheim. The Board granted that exemption after a preliminary hearing on March 10, 1993 and a factfinding hearing on August 19, 1993. Furthermore, the Board granted the exemption "temporarily ... for the period of [American Potomac's] current license (1993–1995)." Pl. Exh. 2. There is no evidence that the Board has granted any exemptions since then.

## II.

■ Plaintiff must satisfy a four-part test to secure a preliminary injunction. It must demonstrate a substantial likelihood of success on the merits; immediate and irreparable injury absent relief; that the threatened harm to it substantially outweighs any harm that an injunction might pose to defendants and third parties; and that the injunction it seeks will serve the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).

### A.

In January, 1934, *Congress* passed the District of Columbia Alcoholic Beverage Control Act (the "ABC Act"), ch. 4, 48 Stat. 319 (1934). The ABC Act, enacted less than two months after ratification of the Twenty-first Amendment abolishing prohibition, established the District's regulatory structure for liquor and created the District of Columbia Alcoholic Beverage Control Board. The ABC Act was codified in title 25 of the District of Columbia Code. In 1987, the *District of Columbia Council* promulgated the Wholesale Liquor Industry Storage Act, which amended section 114(f) of title 25 of the D.C.Code by adding, in relevant part, the following: "[n]o licensee may store beverages upon premises outside the District...." D.C.Code § 25–114(f).

The Board also purports to require that any alcoholic beverage sold by a District wholesaler to a District retail customer must "come to rest" in the District for at least 24 hours prior to sale. The uncontradicted evidence is that the rule is informal and unwritten, but that the Board enforces it. Berenson Aff. ¶ 4. Plaintiff seeks an injunction against enforcement of this portion of the D.C.Code and the "come to rest" rule.

### B.

In 1988, Quality Brands Inc., a licensed alcoholic beverage wholesaler in the District and a competitor of plaintiff Kronheim, sought a declaratory judgment in this Court that the local warehousing requirement enacted by the D.C. Council in the D.C. Wholesale Liquor Industry Storage Act was unconstitutional. *Quality Brands, Inc. v. Barry,* Civ. No. 88–1999. On cross-motions for summary judgment, Judge George Revercomb held that (1) the local warehousing requirement facially discriminates against interstate commerce, *Quality Brands v. Barry,* 715 F.Supp. 1138, 1140 (D.D.C.1989); (2) the articulated purposes given for the requirement cannot withstand the "strict scrutiny" accorded facially discriminatory legislation, *id.* at 1140–42; and (3) the Twenty–First Amendment does not authorize the District to discriminate against interstate commerce protected by the Commerce Clause. *Id.* at 1142–43. Consequently, Judge Revercomb found that the local warehousing requirement embodied in the Act violated the Commerce Clause, and he enjoined its enforcement.

The Court of Appeals affirmed the *Quality Brands* decision without a published opinion. 901 F.2d 1130 (D.C.Cir.1990). In relevant part, its unpublished Memorandum stated:

We have elected to dispose of this appeal by unpublished order primarily because the most substantial argument put forward by the appellants—an argument which, if we accepted it, would allow us to avoid reaching any constitutional issues—was not properly raised before the district court. Under those circumstances, we think it unnecessary to discuss the several rather important and difficult questions of constitutional law involved. Instead, we affirm substantially for the reasons articulated in the opinion of the district court. . . .

Before this court, *the appellants urge that the District of Columbia's Wholesale Liquor Industry Storage Act of 1986 was really only an enforcement of the congressionally enacted District of Columbia Alcoholic Beverage Control Act of 1934. That is, within-the-District storage for all District licensed wholesalers was mandated by Congress' 1934 Act (and the 1935 amendments thereto) which is, of course, not subject to scrutiny under the Commerce Clause. . . .*

.    .    .    .    .

[A]ppellants urge us to address the issue even though it was not raised below. . . . [W]e generally disapprove of that practice and will do so only in exceptional circumstances, where injustice might otherwise result. . . . [T]here are no exceptional circumstances in this case which would justify such an extraordinary step. . . . (emphasis added)

### C.

Plaintiff argues that *Quality Brands* precludes any contention by defendants that the local warehousing requirement is constitutional. First, plaintiff argues that the principle of *res judicata* prevents relitigation of the constitutionality of the requirement. Second, plaintiff argues that even if *res judicata* does not apply, defendants are collaterally estopped from raising the issues decided against them by Judge Revercomb in *Quality Brands.*

"Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the *same parties* or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of *issues* actually litigated and necessary to the outcome of the first action." *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S.

322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979) (emphases added)

■ *Res judicata* is only applicable when the second suit involves the same parties. Accordingly, *res judicata* is inapplicable to the instant case for the simple reason that plaintiff was not a party (nor in privity with a party) to the first action.

■ In contrast, collateral estoppel is available to a nonparty to the original suit. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). In particular, the Supreme Court has permitted *offensive* collateral estoppel by a nonparty to the original suit, i.e., where "a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." *Id.* at 329, 99 S.Ct. at 650. Plaintiff argues that *Parklane Hosiery* precludes defendants from relitigating any of the issues decided in *Quality Brands*.

Defendant responds that offensive collateral estoppel is inapplicable against the government, citing *United States v. Mendoza*, 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984). In *Mendoza*, the Supreme Court held "that *Parklane Hosiery's* approval of nonmutual offensive collateral estoppel is not to be extended to the *United States.*" *Id.* at 158, 104 S.Ct. at 571 (emphasis added). The Court left unclear whether the *Mendoza* holding applied to state or municipal governments. The lower courts are split on the question. *Compare e.g., Hercules Carriers, Inc. v. Claimant State of Florida,* 768 F.2d 1558, 1579 (11th Cir.1985) (holding *Mendoza* applicable to Florida) *with State v. United Cook Inlet Drift Assoc.,* 868 P.2d 913, 917 (Alaska 1994) (holding *Mendoza* inapplicable to Alaska). Neither party has cited, and my research has not uncovered, any case on the applicability of *Mendoza* to the District of Columbia.

■ The applicability of offensive collateral estoppel generally depends upon two factors in a particular case: the promotion of judicial economy, and the unfairness to defendant. *Parklane Hosiery*, 439 U.S. at 329–30, 99 S.Ct. at 650–51. First, if the plaintiff in the second action, in this case Kronheim

(D.C.), had an opportunity to join the first action, but adopted a " 'wait and see' attitude, in the hope that the first action by another plaintiff [would] result in a favorable judgment[, then] offensive use of collateral estoppel [would] likely *increase* rather than decrease the total amount of litigation, since potential plaintiffs [would] have everything to gain and nothing to lose by not intervening in the first action." *Id.* at 330, 99 S.Ct. at 651 (emphasis added) (internal citations omitted). The *Parklane Hosiery* Court wished to discourage an increase in litigation, and hence, held that offensive collateral estoppel would be inappropriate if the plaintiff in the second action had an opportunity to join the first action. Defendants make no claim that plaintiff could have joined the first action. At the time of the *Quality Brands* decision, there was no threat to plaintiff, and hence, plaintiff had no reason to join litigation that was designed to benefit one of its competitors.

Second, "[i]f a defendant in the first action is sued for small or nominal damages, [or] if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant[, or] if the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result," then offensive collateral estoppel could work an unfairness to defendant. *Id.* at 330–31, 99 S.Ct. at 651. In the instant case, for aught that appears, defendants had a full and fair opportunity to litigate the question in *Quality Brands*. The instant action offers defendants no procedural opportunities that were unavailable to them during the first action. Furthermore, the litigation in *Quality Brands* involved stakes similar to the present litigation. In fact, the stakes in that case were sufficiently high for defendants to appeal the adverse judgment. Finally, defendants have pointed to no other decision inconsistent with *Quality Brands*.

Accordingly, defendants are collaterally estopped from disputing the application of Judge Revercomb's ruling in *Quality Brands* to the parallel situation of plaintiffs here: namely, (1) that the local warehousing re-

quirement facially discriminates against the kind of interstate commerce in which plaintiff plans to engage; (2) that the articulated purposes given for the requirement cannot withstand the "strict scrutiny" accorded facially discriminatory legislation; and (3) that the Twenty–First Amendment does not validate the discrimination against the interstate commerce in which plaintiff plans to engage.

Furthermore, the Court of Appeals affirmed Judge Revercomb's decision in *Quality Brands*, 901 F.2d 1130 (D.C.Cir.1990), albeit in an unpublished memorandum, "... substantially for the reasons articulated in the opinion of the district court." Thus, even if defendants were not collaterally estopped from raising the same issues decided by Judge Revercomb, the Court of Appeals' affirmance of *Quality Brands* would constitute further persuasive authority.

### D.

There remains the issue left unanswered by the Court of Appeals' decision in *Quality Brands* as to whether: (1) the ABC Act, passed by Congress in 1934, authorized the local warehousing requirement; (2) the Storage Act, passed by the D.C. Council in 1987, simply clarified that requirement; and (3) the local warehousing requirement is constitutional since federal statutes are not subject to the restrictions of the "negative" Commerce Clause.

The Commerce Clause of the United States Constitution provides that "[t]he Congress shall have Power ... [t]o regulate Commerce ... among the several States...." Art. I, § 8, cl. 3. The so-called "dormant" or "negative" Commerce Clause "directly limits the power of the States to discriminate against interstate commerce." *Wyoming v. Oklahoma*, 502 U.S. 437, 453, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) (citations omitted). The "conventional Commerce Clause analysis [applies] to laws passed by the D.C. government." *Quality Brands*, 715 F.Supp. at 1139. *See also Electrolert Corp. v. Barry*, 737 F.2d 110, 112–13 (D.C.Cir.1990) (applying conventional Commerce Clause analysis to District ordinance). Nonetheless, the "dormant" Commerce Clause does not apply to federal statutes;

"Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid." *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). However, it is well established that "because of the important role the Commerce Clause plays in protecting the free flow of interstate trade, [the Supreme Court] has exempted state statutes from the implied limitations of the Clause *only when the congressional direction to do so has been unmistakably clear.*" *Maine v. Taylor*, 477 U.S. 131, 138–39, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986) (emphasis added) (internal citations omitted). *See also Wyoming v. Oklahoma*, 502 U.S. at 458, 112 S.Ct. at 802 ("Congress must manifest its unambiguous intent before a federal statute will be read to permit or to approve" violation of dormant Commerce Clause); *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 960, 102 S.Ct. 3456, 3466, 73 L.Ed.2d 1254 (1982).

Plaintiff argues that to create a Commerce Clause exemption, a congressional delegation of regulatory power to the *District of Columbia* requires the same explicit congressional directive as an authorization to the states, citing *Stoutenburgh v. Hennick*, 129 U.S. 141, 9 S.Ct. 256, 32 L.Ed. 637 (1889). *Stoutenburgh* involved the question of whether Congress had authorized a District statute requiring commercial agents to obtain a license. On February 21, 1871, Congress promulgated "[a]n act to provide a government for the District of Columbia." On August 23, 1871, the then legislative assembly of the District of Columbia passed an act that required all commercial agents, as well as others engaged in a trade, business or profession, to obtain a license. The commercial agents' license cost $200 annually. In 1873, 1876 and 1887 respectively, Congress passed three laws, repealing various parts of the District's license laws, but leaving the commercial agents' license requirement intact. The Supreme Court found the license requirement to be an unconstitutional "regulation of interstate commerce, so far as applicable to persons soliciting, as Hennick was, the sale of goods on behalf of individuals or firms doing business outside the District." *Id.* at 148, 9 S.Ct. at 258. In finding for Hennick,

the Court rejected Stoutenburgh's arguments that "this legislation, being that of a duly authorized agent of Congress, is that of Congress itself," and that "even if that were not so, Congress has adopted it in the several acts of" 1873, 1876, and 1887. *Id.* at 145. The Court stated: "the failure of Congress to make *express* regulations is equivalent to indicating its will that the subject shall be left free." *Id.* at 148, 9 S.Ct. at 258 (emphasis added). Accordingly, plaintiff argues that since the ABC Act does not contain any *unambiguous* or *explicit* language requiring local warehousing, defendants' congressional authorization argument must fail.

Defendants frame the question differently. Rather than arguing that the ABC Act explicitly intended to prohibit a licensed wholesaler from storing its alcoholic beverages outside of the District, they argue that the ABC Act did not authorize the Board to permit wholesalers to store alcoholic beverages outside the District. Defendants note that in expounding a statute, a court "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its objects and policy." *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987) (citations omitted). Defendants argue that, viewed as a whole, the ABC Act presumes that wholesalers store their alcoholic beverages in the District, and they cite to a number of provisions in the ABC Act to buttress this argument.

Even assuming the statute as a whole presumes that licensed wholesalers warehouse in the District, defendants have failed to identify any section of the 1934 ABC Act (i.e. the statute passed by Congress) which unambiguously gives the Council (or the Board) the authority to *prevent* a licensed wholesaler from storing its liquor outside the District. The ABC Act's failure to *authorize* (or its failure to authorize the Board to permit) warehousing outside the District is irrelevant. While the assumption underlying some sections of the ABC Act may be that a licensed wholesaler must store its goods in the District, no section "explicitly and unambiguously" requires the wholesaler to do so. *See supra* pp. 27–28.

Furthermore, defendants' own argument is undercut by a section of the 1934 ABC Act that contemplated the existence of a licensed wholesaler doing business outside the District. Section 24 of the ABC Act was referred to at the margin of the Statutes at Large volume as "Licensees doing business outside of the District." District of Columbia Alcoholic Beverage Control Act, ch. 4, 48 Stat. 319, 332 (1934). It stated, in relevant part:

> No person holding a wholesaler's or retailer's license shall purchase any beverage, except beer or tax-free wines, from any manufacturer or *wholesaler doing business outside of the District of Columbia and not holding a license issued under the provisions of this Act,* unless such wholesaler or retailer has delivered to the Board a memorandum of the order for such beverages, in duplicate, on a form to be prescribed by the Board . . . (emphasis added)

Thus, section 24 required a District-licensed retailer to deliver to the Board a memorandum of its order purchasing alcoholic beverages from a wholesaler who *both* "do[es] business outside of the District" *and* does "not hold[ ] a license issued under the provisions of the Act." The natural implication is that a District-licensed retailer need not deliver to the Board such a memorandum in order to purchase alcoholic beverages from a wholesaler who does business outside of the District and *does* hold a license issued under the provisions of the Act. It follows then that it must be possible for a wholesaler who does business outside of the District to hold a license issued under the provisions of the Act. While section 24 does not explicitly authorize a licensed wholesaler to *warehouse* its liquor outside of the District, its clear contemplation of a licensed wholesaler *doing business* outside of the District refutes the implication of defendants' argument that the ABC Act required wholesalers to do all their business in the District.

Accordingly, it is likely that plaintiff will prevail on its argument that application of the local warehousing requirement embodied in the District of Columbia Wholesale Liquor Industry Storage Act to prevent

plaintiffs from warehousing their product in Maryland would violate the Commerce Clause.

### E.

Furthermore, the unwritten "come to rest" policy is also likely to be found unconstitutional as applied to plaintiff. Any attempt or threat by defendants to enforce the "come to rest" policy to prevent plaintiff from warehousing its liquor at the Jessup, Maryland facility would have the same constitutional infirmity as the local warehousing requirement embodied in the Wholesale Liquor Industry Storage Act.

In any case, even if the rule were not unconstitutional, defendants have not refuted plaintiff's suggestion that the rule is *ultra vires,* and plaintiff has reserved the right to contest the Board's authority to impose or enforce the rule.

### F.

■ Although defendant did not raise the issue, I have considered *sua sponte* whether plaintiff should have sought an exemption from the Board as a predicate to filing this suit. I conclude that it would have been futile; the Board could not have afforded adequate relief in the window of opportunity available to plaintiffs to acquire the Jessup property.

Plaintiff has demonstrated that it must close on the opportunity to buy the Jessup property more or less immediately or it will go to a competing purchaser. Since it took the board nearly seven months from the preliminary hearing (and presumably even longer from the original application) to grant the most recent request for an exemption, an application from plaintiff would have been futile. In any case, defendants' position is that the statute does not permit out-of-District warehousing at all, and hence, that the Board does not have the authority to grant exemptions. Thus, even in defendants' view, an application to the Board would have been futile.

Furthermore, plaintiff brought this action under 42 U.S.C. § 1983. Section 1983 does not ordinarily require "exhaustion of state judicial or administrative remedies [because of] the paramount role Congress has assigned to the federal courts to protect constitutional rights." *Steffel v. Thompson,* 415 U.S. 452, 472–73, 94 S.Ct. 1209, 1222–23, 39 L.Ed.2d 505 (1974).

Accordingly, plaintiff has demonstrated a substantial likelihood of success on the merits.

### III.

■ The balance of equities heavily favors plaintiff. Plaintiff asserts, without refutation from defendants, that "[i]f the transaction does not go forward immediately, the property will likely be sold to a competitor of Kronheim's who operates businesses in both D.C. and Maryland." Margolies Aff dated January 31, 1995, at ¶ 24. Plaintiff has further asserted that due to the nature of the alcoholic beverage wholesale industry, it may go out of business unless it restores itself to profitability, and that purchase of the Jessup facility is the only way to restore itself to profitability. It has also asserted that if it goes out of business, it will be "invariably unable to reopen [its] business." *Id.* ¶¶ 8–13, 15–18.

The ultimate resolution of this case, particularly given the complex constitutional questions involved, could take weeks or longer, at which point plaintiff would have lost its opportunity to purchase the Jessup warehouse. Thus, plaintiff has shown that absent preliminary injunctive relief, it would suffer immediate injury. Furthermore, "[f]rom the earliest times, courts in equity have considered an injury to real property to be irremediable at law. The uniqueness of land typically makes damages an inadequate remedy." *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1527 (D.C.Cir.1984) (footnote omitted), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). Thus, if plaintiff were unable to purchase the Jessup property, the injury to plaintiff would be irremediable.

The harm to defendants or any third parties of temporarily enjoining the enforcement of an unconstitutional statute and policy is minimal. Defendants argue that granting

the injunction and allowing plaintiff to move its warehouse to Maryland will hamper the District's enforcement of its laws. However, plaintiff must "allow any member of the Board, any investigator of the Board, or any member of the Metropolitan Police Department full opportunity to examine, at any time during business hours, the premises where any beverage is manufactured, kept, sold, or consumed for which ... a license has been granted." 35 D.C.Reg.D.C. 4947, 5002 (1988), amending D.C.Mun.Regs. tit. 23, § 707.1. If plaintiff fails to do so, the District can suspend or revoke its license. D.C.Code § 25–118(a).

Furthermore, the likelihood that the District would lose taxes is low, and the amount it would lose, if any, is unsubstantial. Issuance of the injunction may also help preserve a competitor in the District alcoholic beverage wholesale market, helping to maintain competitive pricing and diversity of products available to consumers. Accordingly, the threatened harm to plaintiff substantially outweighs any harm that an injunction might pose to defendants and third parties, and issuance of the injunction serves the public interest.