**MILTON S. KRONHEIM & COMPANY, INC., Appellee,**

v.

**DISTRICT OF COLUMBIA, et al., Appellants.**

Nos. 95–7053, 95–7168.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 10, 1995.

Decided Aug. 9, 1996.

194

James C. McKay, Jr., Assistant Corporation Counsel, argued the cause for appellants, with whom Garland Pinkston, Jr., Acting Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the briefs.

Bradford A. Berenson, Washington, D.C., argued the cause for appellee, with whom Mark D. Hopson was on the brief.

Nathalie P. Gilfoyle, Washington, D.C., was on the brief for amicus curiae Quality Brands, Inc.

Before: SILBERMAN, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Separate concurring opinion filed by Circuit Judge SILBERMAN.

Separate dissenting opinion filed by Circuit Judge HENDERSON.

SENTELLE, Circuit Judge:

The District of Columbia appeals from an order of the United States District Court preliminarily and permanently enjoining it from enforcing the Storage Act, D.C.Code § 25–114(f), which generally forbids alcoholic beverage licensees from storing beverages outside the District. The district court, relying on a prior district court opinion affirmed by this court without published opinion, held the Act to be an unconstitutional violation of the Interstate Commerce Clause. We determine that the District is not collaterally estopped by the prior opinion from defending the constitutionality of its Act. We therefore reach the merits of the controversy.

The District defends the storage requirement on three grounds. First, that the District of Columbia Alcoholic Beverage Control Act ("ABC Act"), a congressional enactment, authorizes the local warehousing requirement; therefore, the requirement is constitutional as federal statutes are not subject to the restrictions of the Commerce Clause. Second, even if the ABC Act is subject to the restrictions of the Commerce Clause, the local warehousing requirement does not violate the clause. And third, even if the requirement would otherwise violate the Commerce Clause, the Storage Act is constitutional as a valid exercise of the District's core power under § 2 of the Twenty-first Amendment to the Constitution. We hold that, although the ABC Act authorizes the local warehousing requirement, the Act and any statute enacted pursuant to it are subject to the restrictions of the Commerce Clause; but we also hold

that the storage requirement, although facially inconsistent with the Commerce Clause, is constitutional as a valid exercise of the District's core power under the Twenty-first Amendment.

## I. Background

In 1934, following the repeal of Prohibition, Congress enacted the ABC Act to regulate the importation and distribution of liquor within the District of Columbia. Act of Jan. 24, 1934, § 2; D.C.Code § 25–102. The Act created a three-tier system of distribution that, among other things, required manufacturers, wholesalers and retailers to obtain licenses before "manufactur[ing] for sale, keep[ing] for sale, or sell[ing] any alcoholic beverage" within the District of Columbia. ABC Act §§ 9(a), 12; D.C.Code §§ 25–109(a)(1), 113. The Act also established an Alcoholic Beverage Control Board, which was authorized to issue, transfer and revoke any license under the Act. ABC Act §§ 4, 6; D.C.Code §§ 25–104, 106.

In addition, the ABC Act authorized the Commissioners (now the Council of the District of Columbia) to adopt rules to "control and regulate the manufacture, sale, keeping for sale, offer for sale, solicitation of orders for sale, importation, exportation, and transportation of alcoholic beverages in the District of Columbia." ABC Act § 7; D.C.Code § 25–107(a). Acting pursuant to this provision, in 1986 the Council enacted the District of Columbia Wholesale Liquor Industry Storage Act ("the Storage Act"). The Storage Act amended § 13 of the ABC Act by adding a sentence requiring that no alcoholic beverage wholesaler licensed by the District shall "store beverages upon premises outside the District, except that licensed wholesalers permitted by the Board to store beverages outside the District as of January 1, 1986, may continue to do so until July 27, 1988." D.C.Code § 25–114(f).

Appellee Milton S. Kronheim & Co., Inc. ("Kronheim"), a wholesaler of alcoholic beverages licensed under the ABC Act, distributing liquor, beer and wine to District of Columbia retailers, is authorized to store alcoholic beverages at two locations within the District. A Maryland affiliate of Kronheim, The Kronheim Company, Inc., is a licensed wholesale distributor of alcoholic beverages in Maryland. Kronheim desired to consolidate its warehousing operations in the District and Maryland by leasing a facility in Jessup, Maryland. Toward this end, Kronheim filed suit in district court on February 2, 1995, seeking to enjoin enforcement of the Storage Act.

In deciding this case, the district court relied upon an earlier district court decision in *Quality Brands, Inc. v. Barry*, 715 F.Supp. 1138 (D.D.C.1989). In that case, Quality Brands, Inc., a licensed alcoholic beverage wholesaler in the District and a competitor of Kronheim, sought a declaratory judgment that the Storage Act was unconstitutional. The district court held that (1) the local warehousing requirement facially discriminated against interstate commerce in violation of the Commerce Clause, *Quality Brands, Inc.*, 715 F.Supp. at 1139–40; (2) the articulated purposes given for the requirement could not withstand the "strict scrutiny" accorded facially discriminatory legislation, *id.* at 1140–42; and (3) the Twenty-first Amendment did not shield the District's discrimination against interstate commerce, *id.* at 1142–43. Consequently, the *Quality Brands* court concluded that the local warehousing requirement violated the Commerce Clause and enjoined its enforcement. We affirmed that decision without a published opinion. *Quality Brands, Inc. v. Barry*, 901 F.2d 1130, 1990 WL 51795 (D.C.Cir.1990) (per curiam).

In this case, the district court granted Kronheim's motion for a preliminary injunction, finding that Kronheim would suffer irreparable harm if its purchase of the Jessup warehouse did not go forward immediately. *Milton S. Kronheim & Co., Inc. v. District of Columbia*, 877 F.Supp. 21, 30 (D.D.C.1995). The court held that the district court's decision in *Quality Brands* collaterally estopped the District from disputing the constitutionality of the Storage Act. *Id.* at 26–27. The court also determined against the District an issue left open in *Quality Brands*: whether Congress in the ABC Act authorized the District to require local warehousing or itself imposed such a requirement. *Id.* at 27–29.

The District filed an interlocutory appeal from this preliminary injunction. On summary judgment, the district court confirmed its findings, issued a declaratory judgment and permanently enjoined enforcement of the District's local warehousing requirement. The District appealed the final judgment and this court consolidated the two appeals. After the district court granted its preliminary injunction, Kronheim completed the Jessup warehouse transaction and is currently consolidating its inventory in the new warehouse.

## II. Analysis

### A. Collateral Estoppel

■ The first question we must address is whether the District is collaterally estopped from defending the constitutionality of the Storage Act because of the district court's opinion in *Quality Brands, Inc.* Offensive collateral estoppel precludes a defendant "from relitigating identical issues that the defendant litigated and lost against another plaintiff." *Jack Faucett Associates, Inc. v. AT&T Co.*, 744 F.2d 118, 124 (D.C.Cir.1984), *cert. denied*, 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985).

■ Three conditions must be satisfied before a party can be estopped from relitigating an identical issue previously decided:

(1) [T]he issue must have been actually litigated, that is contested by the parties and submitted for determination by the court.

(2) [T]he issue must have been "actually and necessarily determined by a court of competent jurisdiction" in the first trial.

(3) [P]reclusion in the second trial must not work an unfairness.

*Id.* at 125 (quoting *Otherson v. Department of Justice, INS*, 711 F.2d 267, 273 (D.C.Cir. 1983)). The constitutionality of the Storage Act was certainly actually litigated, contested by the parties, and submitted for determination by the court in *Quality Brands*. Further, it was "actually and necessarily determined by a court of competent jurisdiction," at least at the district court level, in that litigation. However, our unpublished affirmance of the district court decision, we must confess, provided no clarity as to what was actually or necessarily determined on appeal. Although our memorandum accompanying the judgment in that matter recited that we affirmed that decision "substantially for the reasons articulated in the opinion of the district court," we expressly stated that at least one other "substantial argument" had not been properly raised and that we did not determine the Commerce Clause issue. Therefore, the district court, obviously unable to reverse our prior decision but receiving little guidance from it for precedential purposes, quite justifiably found the first two elements of collateral estoppel to be present. Also quite justifiably, the district court did not undertake a massive investigation of the further element, as that court would have been in no position to declare the Storage Act constitutional anyway in view of the circuit having reached the result we did in *Quality Brands*. We are not so constrained.

■ While we must follow existing circuit law as established in our precedent, "we are bound only by prior *published opinions* of this Circuit and not by other means of deciding cases." *United States v. North*, 910 F.2d 843, 881 (D.C.Cir.1990) (emphasis in original). We are therefore free in this published opinion to depart from the conclusion reached in our earlier unpublished memorandum. Kronheim understandably offers our unpublished disposition for its preclusive effect. Our circuit rules, while forbidding the citation of unpublished opinions as precedent, nonetheless permit use of those dispositions for preclusion. D.C.Cir. R. 28(c). We do not, however, find preclusion here. Despite the presence of the first element of collateral estoppel, the presence of the second element is much less certain. The third element, that is, that "preclusion in the second trial must not work an unfairness," is not likely to be present where the first or second is unclear. That is, logically there is a fair probability of unfairness in estopping the relitigation of an issue where the fullness of its first litigation is uncertain. Because we have concluded that our decision in *Quality Brands* did not necessarily involve adjudication of the issue before us, and because we have concluded that the district court was misled by our

disposition, we have reexamined the fairness of applying collateral estoppel. We hold that the District was not collaterally estopped from litigating the issues decided in *Quality Brands*. We will therefore proceed to examine the merits of the District's arguments on the constitutionality of the statute.[1]

### B. *The Constitutional Issues*

The constitutional considerations before us are not simple ones to decide, or even to express. Basically, Kronheim's position, tracking the position of the plaintiff in *Quality Brands*, is that the Storage Act, by discriminating against out-of-state storage of alcoholic beverages by wholesalers, unconstitutionally burdens interstate commerce under the Commerce Clause of the Constitution, Art. I, § 8, cl. 3. The *Quality Brands* decision held that it did, that the justifications offered for that discrimination did not pass strict scrutiny, and that the Twenty-first Amendment did not shield the District's Act from interstate Commerce Clause analysis. Because we have held that the *Quality Brands* decision does not have preclusive effect, we will consider the District's answers to Kronheim's arguments.

Before we analyze the merits of the question, we will briefly review the application of the Commerce Clause and the Twenty-first Amendment to enactments of the District of Columbia as it is not immediately apparent that either constitutional provision applies, though after appropriate study, we conclude that each does.

### 1. *The Commerce Clause*

■ Article I, § 8, cl. 3, provides only that "Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Though the face of this provision does not appear to preclude anything, the Supreme Court has long held that the clause not only grants regulatory power to Congress, but also "denies the States the power unjustifiably to discriminate against or burden [interstate commerce]." *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, ──, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994) (citing, *inter alia, Welton v. Missouri*, 91 U.S. 275, 23 L.Ed. 347 (1876)). The Framers intended this "plenary authority over interstate commerce . . . 'to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–26, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979)).

■ This "negative commerce clause" would clearly provide the framework for analysis of the Storage Act if the District of Columbia were a state. That is, we would necessarily examine the legislation to determine if it "unjustifiably . . . discriminat[ed] against or burden[ed] the interstate flow of articles of commerce." *Oregon Waste Systems*, 511 U.S. at ──, 114 S.Ct. at 1349. But D.C. is not a state. Nonetheless, the same analysis applies. Our precedents dictate that we apply to local legislation of the District the same interstate commerce analysis as we would to state laws. *See, e.g., Electrolert Corp. v. Barry*, 737 F.2d 110 (D.C.Cir.1984) (applying negative commerce clause analysis to District legislation banning the possession of radar detectors). Therefore, should we determine that state legislation such as the Storage Act would be invalid under the negative commerce clause analysis, it is as invalid as it would be if the District were a state.

Because one line of the District's defense is that the Twenty-first Amendment empowers it to enact this legislation even in the face

---

1. The dissent takes our result to task for "rais[ing] a number of questions, [including] how today's decision will affect Quality Brands." Dissent at 213 n.9. We obviously do not decide that question as it is not before us, but as our dissenting colleague herself tacitly recognizes, that question will be governed, not by nonmutual offensive collateral estoppel, but rather by case preclusion between the parties to the very action in question, the form of preclusion traditionally known as *res judicata*. *See* Dissent at 213 n.9, and authorities collected therein. Should the District attempt to act against Quality Brands without further legislative enactment, the effects of this decision on the relationship between the parties to the original action will then be ripe for decision.

of the interstate Commerce Clause, we need also determine whether the Twenty-first Amendment applies to the District. Section 2, the relevant section of the amendment, states in its entirety:

The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

"By interpretation of [the Supreme] Court the Amendment has been held to relieve the states of the limitations of the Commerce Clause on their powers over" the transportation or importation into the state of "intoxicating liquor." *Carter v. Virginia*, 321 U.S. 131, 137, 64 S.Ct. 464, 468, 88 L.Ed. 605 (1944). That "relief" has over the years been held far less than absolute, but before we consider the limitations on the states' powers to regulate alcohol within their boundaries under the Twenty-first Amendment, we must first determine whether that Amendment is at all relevant to the District of Columbia, which is still not a state. Ultimately, we conclude that the District for present purposes is to be considered as if it were a state under the Twenty-first Amendment. Because our reasons for so concluding are partially subsumed within the next step of our analysis, we will proceed with that analysis on the assumption that the Twenty-first Amendment applies rather than engage in a discussion that would soon prove duplicative.

### 2. The Congressional Enactment

The District first asserts that the Storage Act is not a violation of the interstate Commerce Clause on the basis that Congress required in-District storage under the ABC Act itself. According to the District, this would shield the Act from Commerce Clause scrutiny, as Congress, acting under the explicit power grant of that clause, obviously cannot be constrained by the implicit negative commerce clause. While this is true as a generality, there is a possible exception applicable to legislation concerning only the District of Columbia. When Congress passes legislation for the District of Columbia under the power expressly delegated to it by Article I, § 8, cl. 17 of the Constitution, "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the] District," it acts "in like manner as the legislature of a State." *Gibbons v. District of Columbia*, 116 U.S. 404, 407, 6 S.Ct. 427, 429, 29 L.Ed. 680 (1886). As such, it may choose "to exercise a *part, only*, of its powers," *Neild v. District of Columbia*, 110 F.2d 246, 251 (D.C.Cir.1940), and limit itself thereby to those powers which would be available to a state legislature. If that is the case with the ABC Act, then arguably the interstate Commerce Clause would apply as if that Act were state legislation rather than a congressional enactment.

However, it does not necessarily follow from the fact that Congress legislates for the District that it intends to deprive itself "of the rest of its powers." *Id.* Even in legislating for the District, Congress may, if it chooses, "exercise ... within the District, general legislative powers delegated to Congress by the Constitution." *Id.* If it has done so in the ABC Act, then there is no colorable argument that the negative commerce clause renders that Act invalid. Therefore, we will proceed to determine whether Congress in enacting that legislation intended to act as the legislature of the District, arguably bound by the negative commerce clause, or as the general legislature, plainly not so bound.

Congress enacted the ABC Act in January of 1934, in direct and express response to the repeal of Prohibition by the Twenty-first Amendment the preceding month. That amendment by itself had worked a fundamental alteration in the balance between regulation of alcohol by the federal government and by the states. It did not, however, resolve the question as to the District of Columbia. *Cf. Norman's on the Waterfront, Inc. v. Wheatley*, 317 F.Supp. 247, 254 (D.Vi. 1970), aff'd, 444 F.2d 1011 (3d Cir.1971) (noting that "[t]hough the 21st Amendment shifted the balance of power to regulate alcoholic beverages in interstate commerce, it did not purport to alter the relationship between Congress and the territories"). Congress therefore passed the ABC Act to fill that void with respect to the District of Columbia. The apparent purpose of the Act read as a

whole was to put the District in essentially the same position with reference to alcoholic beverage control as were the separate states. Thus, while it might be said that Congress was acting "in like manner as the legislature of a State," *Gibbons,* 116 U.S. at 407, 6 S.Ct. at 429, we cannot say with any certainty that Congress intended to deprive itself of the full range of its powers as it was not only determining, state-like, what the regulation of alcoholic beverages should be after the end of Prohibition, but also making the Congress-like determination that the void existed and that it, exercising its plenary power under Art. I, § 8, cl. 17, should fill that gap. With respect to states, the whole range of regulation of alcoholic beverages is exercised under either the Twenty-first Amendment by the states themselves or the interstate Commerce Clause by the Congress. With regard to the District, Congress in 1934 was exercising both powers and it would make no sense to say the Congress could not regulate the interstate commerce aspect because Congress itself was the only body which could. We thus conclude that if Congress mandated the in-District limitation of the Storage Act, then the congressional mandate would not be invalidated by the negative commerce clause.

▮ All of this however does not determine the case. Congress did not in fact mandate the storage requirement, although some provisions of the ABC Act point to an interpretation consistent with that require- ment. It is one thing to contemplate the possibility of a requirement, another to man- date it. The District argues that Congress mandated the requirement when it provided in section 13 that "[e]ach license shall partic- ularly describe the place where the rights of the license are to be exercised. Alcoholic beverages shall not be ... kept for sale ... by any licensee on premises other than the premises designated on the license." D.C.Code § 25–114(e). It notes that section 11(c) of the Act also authorizes wholesalers to sell alcoholic beverages "from the place therein described." D.C.Code § 25– 111(a)(3). The District's argument then cou- ples these concepts with section 2 of the Act, D.C.Code § 25–102, which limits the territo- rial scope of the Act by providing that "[i]t shall apply only to the District of Columbia."

However, neither these nor the similar sec- tions further cited by the District compel the conclusion that Congress intended that a wholesaler could store only at a place within the District.

Section 2 simply makes clear that the li- censing process in question did not contem- plate an attempt by Congress to retake the ground removed by the Twenty-first Amend- ment by regulating the commerce in alcohol within or among the several states. Limiting wholesalers to described premises does not say that those premises must be in the Dis- trict. It may be that Congress so contem- plated, it is not clear that Congress so man- dated. Indeed, it is clear that it did not. If it had, the District Council would have had no need to have amended section 13 in the way now in controversy. Nor, would the District need to be defending that Amend- ment. It might be said that the precise reason we are here is that Congress did not mandate storage only within the District.

As Kronheim notes, the District itself construed the ABC Act as allowing out-of- District storage before the passage of the Storage Act, and even then grandfathered existing non-conforming warehouses. That is obviously inconsistent with its argument for congressional mandate. Kronheim can also argue credibly that section 24 of the Act, captioned "Licensees Doing Business Outside of the District," compels its inter- pretation that wholesalers may store their beverages outside the District. But that section can equally be read as suggesting only that it is permissible under the Act for a District-licensed manufacturer and in lim- ited circumstances a District-licensed whole- saler to do business outside the District. Because the ABC Act neither mandates nor forbids the storage limitation, we face the question left open by our unpublished reso- lution of *Quality Brands*: that is, does the Storage Act violate the negative commerce clause?

### 3. The Storage Act

▮ Because we have determined that the local warehousing requirement of the Storage Act is a creature of the enactment

by the District of Columbia Council and not the Congress, we must determine if it violates the Commerce Clause. In making this determination, we must at last consider whether the District of Columbia is treated as a state for purposes of the Twenty-first Amendment and, if so, what effect section 2 of that Amendment has on the Commerce Clause implications for the Storage Act. One-half of the equation is simple. That is, we will treat the District of Columbia as a state for purposes of Twenty-first Amendment analysis. As noted above, Congress determined at the time of the passage of the ABC Act in response to the repeal of Prohibition in the Twenty-first Amendment that the District would function in a state-like manner for alcohol regulation purposes. We have no warrant to interfere with Congress's plenary power under Art. I, § 8, cl. 17, "[t]o exercise exclusive Legislation in all Cases whatsoever, over [the] District." Thus, when the District Council, acting under its delegated legislative authority, amended the Code, its act was subject to the Commerce Clause, as affected by the interplay between that Clause and the Twenty-first Amendment.

The first step in analyzing whether a state law unjustifiably discriminates or burdens interstate commerce under the "negative" commerce clause is to

> determine whether it "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Hughes* [*v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979).] ... If a restriction on commerce is discriminatory, it is virtually *per se* invalid. By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

*Oregon Waste Systems*, 511 U.S. at ——, 114 S.Ct. at 1350 (citations omitted).

The District argues that the local warehousing requirement does not impermissibly burden interstate commerce. First, it contends that the requirement does not favor District manufacturers over out-of-state

manufacturers as all alcoholic beverages sold in the District are manufactured outside the District, and, even if alcoholic beverages were produced in the District, they would be subject to the same requirement. Second, the District argues that the requirement does not discriminate against out-of-state labor, noting that the ABC Act and the Storage Act do not impose a residency requirement upon workers at storage facilities. And third, the District claims that the requirement does not favor District wholesalers over out-of-state wholesalers as the Acts apply only to wholesalers licensed by the District.

■ Kronheim contends that the storage requirement discriminates against interstate commerce in warehouse facilities and storage space. It argues: "In essence, the Storage Act is a discriminatory local content and processing requirement, which requires alcoholic beverage wholesalers to acquire and maintain ... [an] element[ ] of production—commercial real estate—within the boundaries of the District." We agree with the appellee and find the local warehousing requirement is patently discriminatory. The requirement not only deprives out-of-state businesses access to a local market, *C & A Carbone, Inc. v. Clarkstown, N.Y.*, 511 U.S. 383, ——, 114 S.Ct. 1677, 1681, 128 L.Ed.2d 399 (1994), but also requires business operations be performed in the District even if they could be performed more efficiently elsewhere. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 145, 90 S.Ct. 844, 849, 25 L.Ed.2d 174 (1970).

In this aspect, our analysis of the Storage Act is similar to the Supreme Court's consideration of an ordinance of a New York municipality requiring specified local handling of solid waste which had the effect of depriving out-of-state businesses of a local market by preventing them from performing an initial processing step reserved for a favored local operator. Though the town argued that the ordinance was not discriminatory because it did not differentiate among items of solid waste on the basis of geographic origin, the Court disagreed, noting that "the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." *C & A Carbone, Inc.,*

511 U.S. at ——, 114 S.Ct. at 1682. As appellee notes, the article of commerce at issue here is not so much the sale of alcoholic beverages, but rather, the service of storing the beverages. Regarding this stream of commerce, the Storage Act discriminates as it allows only wholesalers who store their beverages within the District to sell their product. In *Carbone,* the Court struck down the solid waste ordinance holding that "[i]n this light, the ... ordinance is just one more instance of local processing requirements that [the Court] long ha[s] held invalid." *Id.* The same reasoning applies here, and we hold that the Storage Act is facially discriminatory.

■ Because the statute is facially discriminatory, Commerce Clause jurisprudence, ignoring for the moment the effects of the Twenty-first Amendment, would dictate that we should invalidate the statute unless the District can show that the local warehousing requirement "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 278, 108 S.Ct. 1803, 1810, 100 L.Ed.2d 302 (1988); see also *Oregon Waste Systems,* 511 U.S. at ——, 114 S.Ct. at 1351. This inquiry requires the strictest scrutiny. *Hughes,* 441 U.S. at 337, 99 S.Ct. at 1736. Appellant advances two such purposes. First, the District contends that the storage requirement serves important inspection and enforcement interests, noting that the District's power to enforce its alcoholic beverage laws is limited to premises within its borders. Second, the District argues that the storage requirement is integral to both maintaining its "three-tier system of distribution," which strictly separates the functions of supplier, wholesaler and retailer, and discouraging creation of a "tied house," in which one firm controls the entire chain of distribution.

Appellee contests both of these putative regulatory interests. First, appellee argues that the local warehousing requirement does not serve inspection or enforcement interests as the District has never inspected any wholesaler's warehouse or goods prior to distribution to retailers, nor has the District explained why inspections could not occur at a warehouse outside the District. Second, appellant contends that the District makes "little effort to maintain a three-tier level of distribution," noting that even if the District did have such an interest it could be equally served in other non-discriminatory ways. The district court ruled with appellee, relying on the collateral estoppel worked by *Quality Brands.* Because we have ruled that we are not so estopped, we will examine the question anew.

The court in *Quality Brands,* applying strict scrutiny, found that appellant's justifications did not survive scrutiny under the Supreme Court's final test from *Hughes:* that is, "whether non-discriminatory alternatives exist to serve the local purpose." *Quality Brands,* 715 F.Supp. at 1142. In reaching that conclusion, the *Quality Brands* court examined the history of the adoption of the local warehousing requirement, noting that at the time of the Council's vote on the amendment, the general counsel raised the question of the Act's constitutionality, alerting the board to the negative commerce clause implications of protectionist legislation. *Id.* at 1141. A member of the Council suggested "several putatively legitimate state interests which would be promoted by requiring geographic proximity of warehouses, *e.g.,* auditing company records, monitoring compliance with the ABC laws, monitoring licenses, checking tax forms for audits," and similar enforcement goals. *Id.* The *Quality Brands* court rejected the enforcement rationales along with the three-tier licensing system as not established under the lack of nondiscriminatory alternatives test. If this regulation dealt with any industry not governed by the Twenty-first Amendment—that is, any industry except alcoholic beverages— we might well be inclined to agree. However, in the case of alcohol, the problem is a *more difficult one.* Because it is alcohol that the Storage Act regulates, the Twenty-first Amendment does apply, and we must extend our analysis.

As we noted above, "[b]y interpretation of [the Supreme] Court the Amendment has been held to relieve the states of the limitations of the Commerce Clause on their pow-

ers over" the transportation or importation into the state of "intoxicating liquor." *Carter v. Virginia,* 321 U.S. 131, 137, 64 S.Ct. 464, 468, 88 L.Ed. 605 (1944). As we further noted, however, that relief has in more recent years been held far less than absolute. The more recent case *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), is a more current authoritative delineation of the relationship between the Commerce Clause and the Twenty-first Amendment. In *Bacchus,* the Supreme Court considered an Hawaiian statute which imposed an excise tax on liquors sold at wholesale but provided exemptions from that tax for certain locally produced alcoholic beverages. The Court, noting that "[t]he legislature's reason for exempting" the local liquors was to "promote the establishment of a new industry" and "'to help' in stimulating" a local industry. 468 U.S. at 270, 104 S.Ct. at 3055 (quoting *In re Bacchus Imports, Ltd.,* 65 Haw. 566, 573–74, 656 P.2d 724, 730 (1982)).

The Supreme Court held that this protectionist legislation "violated the Commerce Clause because it had both the purpose and effect of discriminating in favor of local products." *Bacchus,* 468 U.S. at 273, 104 S.Ct. at 3056. The state of Hawaii argued that the Twenty-first Amendment saved the tax exemption from the fate it would have endured under "ordinary Commerce Clause principles." *Id.* at 274, 104 S.Ct. at 3056. The Court rejected that argument, noting that "[t]he central purpose" of the Twenty-first Amendment "was not to empower States to favor local liquor industries by erecting barriers to competition." *Id.* at 276, 104 S.Ct. at 3058. Because Hawaii's justification for its tax structure discriminating against interstate commerce was the promotion of local industry, the statute before the Court "constitute[d] mere economic protectionism" and was "therefore not entitled to the same deference as laws enacted to combat the perceived evils of an unrestricted traffic in liquor." *Id.*

Kronheim may colorably and even credibly argue that the District's local warehousing requirement is protectionist. Indeed, we cannot say with any assuredness that protec-

tionism is not a purpose of the legislation. Nonetheless, the Storage Act both by its terms and according to its history is designed to advance the core enforcement purposes protected by section 2 of the Twenty-first Amendment. In this case then, the legislative body operated with a mixed motive.

While under *Bacchus* and other Supreme Court decisions, *e.g., 324 Liquor Corp. v. Duffy,* 479 U.S. 335, 107 S.Ct. 720, 93 L.Ed.2d 667 (1987), the Supreme Court has been consistently emphasizing limitations on the Twenty-first Amendment power of the states, the nonprotectionist side of the District's mixed motive places section 2 squarely within the Amendment's ambit. Thus, unlike the Hawaiian statute, it was "enacted to combat the perceived evils of an unrestricted traffic in liquor," as set out in the councilman's statement analyzed by the *Quality Brands* court. The *Bacchus* decision struck down the Hawaiian statute "because the tax violates a central tenet of the Commerce Clause but is not supported by any clear concern of the Twenty-first Amendment." *Bacchus,* 468 U.S. at 276, 104 S.Ct. at 3058. The Supreme Court has long recognized that the Amendment "created an exception to the normal operation of the Commerce Clause," *Craig v. Boren,* 429 U.S. 190, 206, 97 S.Ct. 451, 461, 50 L.Ed.2d 397 (1976), and that the resultant authority of the state under the Amendment over importation of intoxicants "is transparently clear." *Id.* at 207, 97 S.Ct. at 462. The Court has also concluded that the state's authority under the Amendment includes the "plenary power to regulate and control ... the distribution, use, or consumption of intoxicants within her territory after they have been imported." *Department of Revenue v. James B. Beam Distilling Co.,* 377 U.S. 341, 346, 84 S.Ct. 1247, 1250, 12 L.Ed.2d 362 (1964). Nothing in *Bacchus* or the other later cases overrules the principles iterated in the *Boren* and *Beam* cases. Despite the mixing with the tainted motive of protectionism, D.C.'s claimed motives of "legitimate state interests which would be promoted by requiring geographic proximity of warehouses, *e.g.,* auditing company records, monitoring compliance with the ABC laws, monitoring licenses, checking tax forms for audits, etc.," *Quality Brands,* 715 F.Supp. at

1141, falls squarely within the state's core enforcement powers over alcohol.

Eloquently testifying to the legitimacy of the District's claims, as well as to the potentially dire consequences of the precedent we might establish by striking the Act, are an array of state statutes subject to potential attack on the same Commerce Clause basis. *See, e.g.,* Ark.Code § 3–5–216(a) (1987) ("[L]ight wines or beer ... may be received and kept in storage at a distributor's place of business in this state"); Cal. Bus. & Prof. Code § 23355.1(a) (1992) ("Deliveries of distilled spirits by a licensee to a retail licensee may be made from the vendor's licensed premises or from a warehouse located within the county in which the vendor's licensed premises are located ..."); Colo.Rev.Stat. § 12–47–115(1)(a)(I), (b)(I), (c.5) (1985 Rep. Vol.) ("A wholesaler's liquor license shall be issued ... for the following purposes only: (I) To maintain and operate two warehouses and one sales room in this state ... "); Del.Code tit. 4, § 501(f) (1993) ("No person may import into this State any alcoholic liquor unless it is delivered directly to a licensed warehouse or warehouses in Delaware...and is unloaded and physically stored in said warehouse or warehouses."); Fla. Stat. § 561.54 (1987) ("It is unlawful ... to make delivery from without the state of any alcoholic beverage to any person ... within this state, except ... qualified bonded warehouses in this state"); N.J.Rev.Stat. § 33:1–11 (1993) ("[T]he delivery of such alcoholic beverages by the holder of [a plenary wholesaler's] license to retailers ... shall be from inventory in a warehouse located in New Jersey which is operated under a plenary wholesale license."); Minn.Stat. § 340A.305 (1994) ("All licensed wholesalers must own or lease warehouse space within the state and must have adequate delivery facilities to perform the function of a wholesaler.... [A]lcoholic beverages manufactured outside the state ... must be unloaded into the wholesaler's warehouse located in this state. Licensed wholesalers may distribute alcoholic beverages only from the warehouse"); Okla. Stat. Ann. tit. 37, § 521.E (1995) ("A wholesaler license shall authorize the holder thereof to operate a single bonded warehouse with a single central office together with delivery facilities at a location in this state only at the principal place of business for which the wholesaler license was granted."); S.D. Compiled Laws Anno. § 35–4–45 (1992) ("Any bonded warehouse within South Dakota may, upon compliance with the provisions of this section, receive alcoholic beverages for storage purposes").

We therefore conclude that although the Act facially violates the negative commerce clause, it is supported by a clear concern for the core enforcement function of the Twenty-first Amendment, and we therefore reverse the district court's decision declaring the statute unconstitutional.

### III. Conclusion

For the reasons set forth above, we conclude that the local warehousing requirement of the Storage Act is constitutional. The decision of the district court is reversed.

SILBERMAN, Circuit Judge, concurring:

I concur, but write separately to explain the effect, as I see it, of our prior decision in *Quality Brands, Inc. v. Barry,* 901 F.2d 1130 (D.C.Cir.1990) (Unpublished Memorandum) (per curiam).

In *Quality Brands,* the district court determined that D.C.'s in-district warehousing requirement facially violated the Commerce Clause, that it was not justified by compelling government purposes, and that given the Supreme Court's recent limitations, the Twenty First Amendment did not authorize the District's discrimination. 715 F.Supp. 1138, 1140–42 (D.D.C.1989). D.C. appealed, and on appeal offered a new argument: that the congressional ABC Act directly imposed the in-district warehousing requirement, obviating any Commerce Clause inquiry. In an unpublished memorandum decision, we explained that

> [w]e have elected to dispose of this appeal by unpublished order primarily because the most substantial argument put forward by the appellants—an argument which, if we accepted it, would allow us to avoid reaching any constitutional issue—was not properly raised before the district court. Under these circumstances, we think it

unnecessary to discuss the several rather important and difficult questions of constitutional law involved. Instead, we affirm substantially for the reasons articulated in the opinion of the district court.

Kronheim's subsequent suit against the District raised the same issue as the *Quality Brands* suit, *i.e.*, whether the District constitutionally could require in-district warehousing. Kronheim asserted that the *Quality Brands* decision collaterally estopped D.C. from arguing the constitutional issues (although not the statutory claim). The district court agreed that D.C. was estopped since Kronheim could not easily have joined the prior suit and since estoppel was not unfair to the District. It cited our statement that "we affirm substantially for the reasons ... of the district court" in support of its conclusion that the District was estopped. Although the court noted the District's argument that non-mutual collateral estoppel does not apply to the government, it stated that it was unclear whether this applied to state governments or to the District and then nevertheless, without resolving this issue, proceeded to apply the analysis developed in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329–31, 99 S.Ct. 645, 650–52, 58 L.Ed.2d 552 (1979), for non-governmental actors.

To be sure, our statement that "we affirm substantially for the reasons ... of the district court" is rather confusing. But I think the fair import of our decision, read as a whole, is that we expressly refrained from deciding the constitutional questions, both Commerce Clause and Twenty First Amendment, because the District had raised a new issue on appeal: whether Congress had imposed the warehousing requirement by statute—in which case the constitutional issues would not be relevant. We did not publish in order to avoid giving our opinion precedential effect, which could only mean we wished to preserve the District's opportunity to raise the issue again. It should be understood

that not establishing a precedent in these circumstances is essentially the same as not creating collateral estoppel against the District, because only the District would be the subject of a subsequent suit. Although it is possible to read our memorandum, as does appellee, as leaving open only the statutory issue, Judge Sentelle's opinion makes clear that the two are intertwined. And, it would be anomalous for us to conclusively resolve an important constitutional issue by simply stating we agree "substantially" with the district court.

Even had we decided *Quality Brands* in a published decision on the merits, it is not clear collateral estoppel would apply. Collateral estoppel is not generally available against the federal government, *U.S. v. Mendoza*, 464 U.S. 154, 159–63, 104 S.Ct. 568, 571–74, 78 L.Ed.2d 379 (1984), and this rule may very well apply to the states. *See Hercules Carriers, Inc. v. Florida*, 768 F.2d 1558, 1578–79 (11th Cir.1985) (applies to states); *but see State v. United Cook Inlet Drift Assoc.*, 895 P.2d 947, 950–52 (Alaska 1995) (does not apply to Alaska). *Mendoza* held that the non-mutual offensive collateral estoppel applied in *Parklane Hosiery* did not pertain to the federal government because the government is not in the same position as a private litigant. The government litigates quantities of suits, often involving issues of public importance, and it may decide not to appeal for policy reasons or due to the constraints of limited resources. Making the first decision final freezes development of the law and forces the government to appeal every decision as a precautionary matter. *See Hercules Carriers*, 768 F.2d at 1578–79. (Of course that the District did appeal in *Quality Brands* does not affect this doctrinal reasoning.). We need not decide whether the *Mendoza* doctrine applies to District litigation, however, because in my view our *Quality Brands* opinion was not designed to and did not have preclusive effect.[1]

1. I am also unsure whether the other requirements for non-mutual offensive collateral estoppel are met. *See Parklane Hosiery*, 439 U.S. at 329–31, 99 S.Ct. at 650–52. For the reasons discussed above, it is not clear that the constitutional issues were actually and necessarily determined in our prior decision, since we purported

not to reach them. And given our refusal to reach the issues in that appeal, it seems unfair to bind D.C. to the district court decision. It also appears possible for Kronheim to have intervened in the prior case; clearly Kronheim's ability to determine where to locate its warehouses

KAREN LeCRAFT HENDERSON,
*Circuit Judge, dissenting:*

The majority holds that the Wholesale Liquor Industry Storage Act of 1986 (Storage Act) discriminates against interstate commerce: it is "patently discriminatory" because the "[local warehousing] requirement not only deprives out-of-state businesses access to a local market but also requires business operations be performed in the District even if they could be performed more efficiently elsewhere." Majority Opinion (Maj. Op.) at 201 (citations omitted). As a result, the Storage Act violates the dormant commerce clause, and thus is unconstitutional, unless it survives strict scrutiny. The majority concludes that, regardless whether the Storage Act meets strict scrutiny, the legislation is a valid exercise of core twenty-first amendment power—because a District of Columbia (District) councilman said so. *Id.* at 202–04.

The trouble is that the District unsuccessfully litigated the dormant commerce clause and twenty-first amendment issues over six years ago. Accordingly the court below concluded that the doctrine of issue preclusion, in particular nonmutual offensive collateral estoppel, bars the District from relitigating the constitutionality of the Storage Act. In my view the district court did not err in so concluding and therefore I would not reach the merits. I respectfully dissent.

## I. BACKGROUND

### A. *Legislative History of the Storage Act.*

In 1979 the District's Alcoholic Beverages Control Board (Board) granted Quality Brands, Inc., a District-licensed wholesaler, permission to store its District-bound alcoholic beverages in Maryland. As a result, jobs within the jurisdiction of Local 639 of the International Brotherhood of Teamsters were lost to Maryland. Local 639 then lobbied the District's governing body, the District Council (Council), to enact legislation prohibiting wholesalers from using warehouse facilities outside the District. To that end, in 1981 a bill entitled the "Wholesale Liquor Industry Job Protection Act" was

introduced. Substantially identical bills were reintroduced in 1983 and 1985 bearing the same eyebrow-raising title.

In January 1986 the Council's Committee on Consumer and Regulatory Affairs held a hearing on the proposed legislation. The record manifests that the witnesses who testified at the hearing, including the president of Local 639, focused exclusively on the loss of jobs and tax revenue resulting from wholesalers using warehouse facilities outside the District. For example, the director of the District Department of Consumer and Regulatory Affairs testified, "The executive supports this bill because it will create and protect jobs for District of Columbia residents. This bill would also increase the tax base because current and prospective licensees would have to use facilities in the city to store their beverages." Appellee's Legislative History and Statutory Addendum (Appellees Addendum) 50. A competitor of Quality Brands testified that the authorization extended to Quality Brands put his company at a competitive disadvantage and emphasized that it "has meant and will mean the continuing layoff of employees in Washington, as well as shrink the tax base." *Id.* at 44. The president and general counsel of the D.C. Wine & Spirits Wholesalers Association, Inc., a trade association consisting of five District-licensed wholesalers, urged passage of the bill, which the association viewed "as a job protection act." *Id.* at 47 (emphasis in original). The committee report accompanying the bill described the bill as a job protection measure. *See* Appellant's Statutory and Legislative History Addendum (Appellant's Addendum) 55–57.

In short, the Storage Act (aka "Job Protection Act") was conceived and justified as an act of pure economic protectionism. No other justification was asserted. No one suggested that the local warehousing requirement would assist the District in regulating alcoholic beverages. This is not surprising: The record contains no evidence that District officials have ever even visited a wholesaler's warehouse. And the record manifests that a wholesaler can store beverages outside the District yet comply with the

was at stake, even if it had no plans for an

immediate move.

Alcoholic Beverages Control Act (ABC Act), enacted by Congress in 1934, and its implementing regulations. *See* Brief of Amicus Curiae Quality Brands, Inc., Exhibit G. (admissions of District).

At any rate, the bill came before the Council as a whole during a legislative session in April 1986. A council member noted that the Council's General Counsel had expressed concern about the legality of the local warehousing requirement under the dormant commerce clause because the legislation amounted to economic protectionism. Councilman John Ray responded that the Storage Act was more than that:

> The interest that we have ... is to audit the records of these companies, to check their warehouses to make sure that they're in compliance with the ABC laws of the District of Columbia, to make sure their licenses are posted correctly, to check each and every truck they own to make sure their licenses are posted correctly, to make sure all the lettering and numbering of these trucks are correct and in accordance with our licensing laws, to make sure that their tax forms are file [sic] so that we can audit to make sure that they're paying the proper taxes to the District of Columbia because taxes are based upon the gallons they sell per year, and all other laws which comply [sic] with the District of Columbia.

Appellant's Addendum 62.[1] The bill passed its first reading. On second reading three days later, it passed with a "grandfather" provision exempting from the Storage Act those District-based wholesalers then operating warehouses outside the District (*i.e.*, Quality Brands). At the third and final reading of the bill an amendment was offered to remove the grandfather provision and to replace it with a provision which, in effect, gave Quality Brands a 2-year grace period before it had to find a warehouse in the District. The bill passed as amended and became law.

## B. *Quality Brands' Lawsuit.*

Quality Brands filed a lawsuit in 1988 to challenge the constitutionality of the Storage Act. The district court held that the Storage Act violated the dormant commerce clause because it facially discriminated against interstate commerce and could not withstand strict scrutiny. *Quality Brands, Inc. v. Barry,* 715 F.Supp. 1138, 1139–42 (D.D.C.1989). The court further held that the Storage Act was not designed to serve a core purpose of the twenty-first amendment. *Id.* at 1142–43. Accordingly it "ordered that enforcement of the Act is enjoined." *Id.* at 1143.

On appeal this Court affirmed the district court's judgment enjoining enforcement of the Storage Act. *Quality Brands, Inc. v. Barry,* 901 F.2d 1130 (D.C.Cir.1990) (table); Joint Appendix (JA) 64 ("ORDERED and ADJUDGED, by this Court, that the judgment of the District Court appealed from in this cause is hereby affirmed for the reasons set forth in the accompanying memorandum."). An accompanying unpublished memorandum stated: "we affirm substantially for the reasons articulated in the opinion of the district court." *Quality Brands, Inc. v. Barry,* 901 F.2d 1130, 1990 WL 51795, at *1 (D.C.Cir.). The memorandum explained that the court declined to consider an argument the District failed to "press" in the district court, namely that the Storage Act did not violate the dormant commerce clause because the local storage requirement in fact flowed from the congressionally-enacted ABC Act.

## C. *Kronheim's Lawsuit.*

Milton S. Kronheim & Co., Inc. (Kronheim) is a District-licensed wholesaler. Kronheim has been a wholesaler in the District since 1903. Historically the company has used warehouses in the District and, indeed, in 1986 the company lobbied (through its trade association) in support of the Storage Act. A decade later, however, Kronheim, on the brink of a financial crisis, determined that it could not operate at a profit if it continued to store its inventory in the District. JA 48, 55. Kronheim proposed to consolidate, in a Maryland warehouse, its

---

1. It is Ray's unsupported "11th-hour" statement, a statement essentially made in anticipation of litigation, on which the majority relies to conclude that the Council enacted the Storage Act "'to combat the perceived evils of an unrestricted traffic in liquor.'" Maj. Op. at 203 (quoting *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 276, 104 S.Ct. 3049, 3058, 82 L.Ed.2d 200 (1984)).

District-bound inventory with the inventory of its Maryland affiliate. With its warehouse leases in the District set to expire in early 1995, Kronheim applied in February 1995 for a preliminary injunction to enjoin the District from enforcing the Storage Act.[2] The district court granted the injunction. The court held:

> [The District is] collaterally estopped from disputing the application of Judge Revercomb's ruling in *Quality Brands* to the parallel situation of plaintiffs [sic] here: namely, (1) that the local warehousing requirement facially discriminates against the kind of interstate commerce in which plaintiff plans to engage; (2) that the articulated purposes given for the requirement cannot withstand the "strict scrutiny" accorded facially discriminatory legislation; and (3) that the Twenty–First Amendment does not validate the discrimination against the interstate commerce in which plaintiff plans to engage.

*Milton S. Kronheim & Co., Inc. v. District of Columbia,* 877 F.Supp. 21, 26–27 (D.D.C. 1995). The court below added that this Court's affirmance of the *Quality Brands* judgment constituted "further persuasive authority" for applying collateral estoppel. *Id.* at 27. Finally, the court below rejected on the merits the statutory issue this Court declined to consider in *Quality Brands,* to wit, whether Congress, *via* the ABC Act, prohibited District-licensed wholesalers from storing alcoholic beverages outside the District. *Id.* at 27–29.

The majority today agrees with the latter ruling, holding that the local warehousing requirement is a creature of the District, not Congress, and thus is subject to the dormant commerce clause. The majority nevertheless

reverses. Over six years after our order in *Quality Brands* affirming the ruling that the Storage Act is unconstitutional, the majority now reverses field and concludes that the Storage Act is constitutional. The majority errs, I respectfully submit, in (again) passing on the constitutionality of the Storage Act because the lower court correctly concluded that the doctrine of nonmutual offensive collateral estoppel bars the District from relitigating the dormant commerce clause and the twenty-first amendment issues.

## II. NONMUTUAL OFFENSIVE COLLATERAL ESTOPPEL Can APPLY TO THE DISTRICT

Before addressing why I believe the District is collaterally estopped from defending the constitutionality of the Storage Act, I must address the District's argument that it should always be immune from the application of nonmutual offensive collateral estoppel.[3] The argument is grounded on the Supreme Court's decision in *United States v. Mendoza,* 464 U.S. 154, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984), a due process case involving the *federal* government. The Court held that "nonmutual offensive collateral estoppel simply does not apply against the Government in such a way as to preclude relitigation of issues such as those in this case." *Id.* at 162, 104 S.Ct. at 573. The Court observed that the federal government is more likely than any private party to be involved in lawsuits against different parties raising the same legal issues: the federal government litigates nationwide in multiple forums and frequently litigates legal questions of substantial public importance. *Id.* at 160, 104 S.Ct. at 572. The crux of the Court's opinion is its observation that allow-

2. According to Kronheim's complaint, the District continued to enforce the Storage Act notwithstanding the *Quality Brands* holding. JA 12. In addition, the complaint alleged that the District, through the Alcoholic Beverage Control Board, was enforcing an unwritten "come to rest" policy—requiring alcoholic beverages sold by a District-licensed wholesaler to "come to rest" in the District at least 24 hours before being sold to a retailer—in an attempt to evade our decision in *Quality Brands. Id.* Kronheim urged that both the District's enforcement of the Storage Act and the Board's "come to rest" policy—both requiring local storage—violated

the dormant commerce clause and that *Quality Brands* precluded the District from relitigating the constitutionality of a local storage requirement.

3. Nonmutual offensive collateral estoppel "occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against ... a different party." *United States v. Mendoza,* 464 U.S. 154, 159 n. 4, 104 S.Ct. 568, 571 n. 4, 78 L.Ed.2d 379 (1984).

ing nonmutual offensive collateral estoppel to be used against the federal government would have two adverse consequences. First, and most important, it "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue," thereby "depriv[ing] [the] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before [the] Court grants certiorari." *Id.* at 160, 104 S.Ct. at 572. Second, "[t]he Solicitor General's policy for determining when to appeal an adverse decision would also require substantial revision" because the Solicitor General would, in effect, have "to appeal every adverse decision in order to avoid foreclosing further review." *Id.* at 160–61, 104 S.Ct. at 572; *see also id.* at 163, 104 S.Ct. at 574; *cf. United States v. Stauffer Chem. Co.*, 464 U.S. 165, 173 & n. 6, 104 S.Ct. 575, 579 & n. 6, 78 L.Ed.2d 388 (1984).

*Mendoza*'s rationale is inapplicable to the District. *Cf. State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 950–52 (Alaska 1995) (distinguishing *Mendoza* and holding that state of Alaska is not exempt from nonmutual offensive collateral estoppel). The District does not litigate in multiple federal forums but rather in one federal circuit with one district court. Therefore, immunizing the District from nonmutual offensive collateral estoppel will not "better allow thorough development of legal doctrine by allowing litigation in multiple forums," *Mendoza*, 464 U.S. at 163, 104 S.Ct. at 574, or prevent "freezing the development of the law," *id.* at 164, 104 S.Ct. at 574. Moreover, compared to the Solicitor General, the District's Corporation Counsel is responsible for far less litigation and the District does not assert that its Counsel maintains, or has a compelling need to maintain, a "policy of circumspection in determining when to pursue appeals."

*Stauffer Chem.*, 464 U.S. at 173 n. 6, 104 S.Ct. at 580 n. 6.[4]

No legitimate public policy would be served by immunizing the District from nonmutual offensive collateral estoppel here. True, the District, like all government entities, does at times litigate issues of "substantial public importance." *Mendoza*, 464 U.S. at 160, 104 S.Ct. at 572. But if the District receives an adverse district court decision, it can appeal to this Court, and an adverse decision by this Court will bind the District in future litigation irrespective of the applicability of nonmutual offensive collateral estoppel: principles of res judicata and estoppel will bar the District from relitigating the issue with the *same* party; and *stare decisis* should ordinarily preclude the District from relitigating the issue with a *different* party (this Court publishes the disposition of an issue of substantial public importance, D.C.Cir. R. 36(a), and published decisions have precedential effect, D.C.Cir. R. 28(c)). If we decline to pass on the merits of such an issue, the District can move to vacate the district court's judgment and thereby deprive it of any preclusive effect.

### III. COLLATERAL ESTOPPEL BARS RELITIGATION OF THE CONSTITUTIONAL ISSUES

The District raises three issues in defense of the Storage Act. First, as a threshold issue, the District argues that the local warehousing requirement was imposed by Congress and thus the dormant commerce clause is inapplicable. Second, the Storage Act does not violate the dormant commerce clause because it does not discriminate against interstate commerce or, if it does, it nonetheless passes strict scrutiny. Third, irrespective of its impact on interstate commerce, the Storage Act is sanctioned by the twenty-first amendment.

4. The District relies on *Hercules Carriers, Inc. v. Florida*, 768 F.2d 1558 (11th Cir.1985), where the court held "that the rationale outlined by the Supreme Court in *Mendoza* for not applying nonmutual collateral estoppel against the government is equally applicable to state governments." *Id.* at 1579. *Hercules* offered no supporting analysis but instead relied on two observations. First, *Mendoza* "did not differentiate between federal governmental interests and state governmental interests." *Id.* Of course not; the case dealt only with the federal government. Second, *Hercules* stated that *Mendoza* contained nothing "to suggest that the concerns expressed by the Supreme Court were peculiar to the federal government." *Id.* That statement is simply incorrect. At any rate, unlike the states in the Eleventh Circuit, the District does not litigate in multiple federal district courts.

The court below concluded that the threshold (statutory) issue had no merit and the majority agrees.[5] I would add that the argument is downright disingenuous. The District contends that the Storage Act "was enacted by the Council simply to make it clear" that the "ABC Act, as it was enacted by Congress, prohibits wholesalers from storing alcoholic beverages outside the District." Brief of Appellant at 18. But the record belies any claim that the Council thought Congress prohibited storage outside the District. First, the committee report accompanying the bill stated that "there are no statutory restrictions" in the ABC Act regarding storage outside the District. Appellant's Addendum 55. Councilman Ray, who authored the report, elsewhere explained to the Council that the Council could permit a wholesaler to store its inventory outside the District. *Id.* at 63, 67, 80. Second, the Council added, on second reading, a grandfather provision which would have allowed Quality Brands to continue to store its beverages in Maryland, plainly violating the purported congressional mandate. Third, the Council's General Counsel doubted the constitutionality of the bill under the dormant commerce clause, which does not apply to a congressional mandate. In short, the Council did not act on the premise that Congress mandated required local warehousing. The claim is instead a *post hoc* rationale offered to save the Storage Act, and an unpersuasive one at that.

A. *This Court's disposition in* Quality Brands *has preclusive effect.*

Once we dispose of the threshold issue we are left with the dormant commerce clause and the twenty-first amendment issues. These are the precise issues litigated and adjudicated in *Quality Brands.* The majority concedes that the constitutional issues were "actually litigated" and "actually and necessarily determined" by the district court in *Quality Brands.* Maj. Op. at 197. On appeal this Court issued an order *affirming* that judgment. The accompanying unpublished memorandum declared that the panel affirmed "substantially for the reasons artic-

ulated in the opinion of the district court," *Quality Brands,* 1990 WL 51795, at *1, an opinion which decided both the commerce clause and the twenty-first amendment issues (there were no alternative holdings). *See Quality Brands,* 715 F.Supp. at 1139–43. Our disposition in *Quality Brands* should estop the District from relitigating the constitutional issues. It is of no consequence that we did not expressly (and again) analyze the issues. *See Securities Indus. Ass'n v. Board of Governors,* 900 F.2d 360, 364–65 (D.C.Cir.1990) ("even when an opinion is silent on a particular issue, issue preclusion applies if resolution of that issue was necessary to the judgment"); *American Iron & Steel Inst. v. EPA,* 886 F.2d 390, 397 (D.C.Cir.1989) (same "even in absence of *any* opinion") (emphasis in original), *cert. denied,* 497 U.S. 1003, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990). Nor does it matter that we affirmed in an unpublished decision. D.C.Cir. R. 28(c) (unpublished decision has preclusive effect). What matters is that we affirmed the district court for the reasons the district court used.

The majority asserts that "our decision in *Quality Brands* did not necessarily involve adjudication of the issue[s] before us." Maj. Op. at 197. I do not understand how the statement can be correct. We affirmed the district court's judgment. However "murky" the language of the unpublished memorandum, *see id.* at 196, there is no dodging the fact that the only issues the district court decided in *Quality Brands* were the constitutional issues and they were the only issues we could have affirmed "substantially for the reasons" the district court gave. Indeed, because we plainly did not reverse or vacate the injunction or dismiss the appeal, we *necessarily* adjudicated the constitutional issues. *See Watts v. United States,* 402 F.2d 676, 685 (D.C.Cir.1968) ("Collateral estoppel will prevent the relitigation of an issue that was necessary to a prior judgment or final disposition of a case."), *rev'd on other grounds,* 394 U.S. 705, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969). Contrary to the majority's reading, the unpublished memorandum in *Quality Brands* nowhere "expressly stated ... that

---

5. Kronheim does not argue that the District is

collaterally estopped from raising this issue.

we did not *determine* the" constitutional issues. Maj. Op. at 197 (emphasis added); Concurring Opinion (Con. Op.) at 205 ("we expressly refrained from deciding the constitutional questions"). Rather, it stated that we "elected to dispose of th[e] appeal by unpublished opinion" and that we thought "it unnecessary to *discuss*" the constitutional issues but would instead "affirm substantially for the reasons articulated in the opinion of the district court." *Quality Brands,* 1990 WL 51795, at *1 (emphasis added).

The concurring opinion's deconstruction of the unpublished memorandum is not persuasive. According to the concurring opinion, "[w]e did not publish to avoid giving our opinion precedential effect, which could only mean we wished to preserve the District's opportunity to raise the [constitutional] issue again." Con. Op. at 205. Why, then, the affirmance? As I read the unpublished memorandum, *Quality Brands* affirmed the trial judge but declined to publish any discussion of the constitutional issues because, in the event the District's statutory argument had merit, a published opinion would have constituted an advisory opinion both on the dormant commerce clause and the twenty-first amendment. There is no suggestion in the unpublished memorandum that "we wished to preserve the District's opportunity to" have another crack at litigating the constitutional issues. Even if that were its unarticulated objective, the court failed in that objective because it overlooked the preclusive effect of the order affirming the lower court.

In any event, if forced to choose, why would we defer to an internally inconsistent unpublished memorandum over the unequivocal affirmance? Litigants and district judges rely on the judgments of this Court and should have confidence that our judgments mean what they say. I would not

disregard our judgment and mandate in *Quality Brands.*

**B.** *The district court's unmodified judgment in* Quality Brands *has preclusive effect.*

Even if we ignore our affirming order and indulge the fiction that we did not adjudicate the constitutional issues in *Quality Brands,* the majority is not out of the woods. The Supreme Court has held that collateral estoppel applies "so long as the judgment in the first suit remains unmodified." *Southern Pac. R.R. Co. v. United States,* 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). The majority cannot deny that in *Quality Brands* we did not reverse, vacate or set aside the lower court's judgment enjoining enforcement of the Storage Act. The district court's unmodified judgment should therefore be accorded preclusive effect. *Hubbell v. United States,* 171 U.S. 203, 18 S.Ct. 828, 43 L.Ed. 136 (1898).[6]

Yet the majority disregards the district court's judgment. Why? Because we purportedly declined to review it. But it is well established that a lower court judgment may have preclusive effect despite the lack of appellate review. *Johnson Steel Street–Rail Co. v. William Wharton Jr. & Co.,* 152 U.S. 252, 14 S.Ct. 608, 38 L.Ed. 429 (1894) (appellate "re-examination" not necessary); *Hubbell,* 171 U.S. at 210, 18 S.Ct. at 831; *Angel v. Bullington,* 330 U.S. 183, 189–90, 67 S.Ct. 657, 660–61, 91 L.Ed. 832 (1947); *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 2427, 69 L.Ed.2d 103 (1981). This principle applies not only when the losing party fails to appeal an adverse judgment but also when the losing party does appeal and the appeal is dismissed without appellate review on the merits.[7]

*Wight v. Montana–Dakota Util. Co.,* 299 F.2d 470 (9th Cir.1962), is instructive. A

---

**6.** *Hubbell* declared that the judgment of a lower court in a prior suit "operate[s] as a complete estoppel to the present suit, *unless the proceedings subsequent to the judgment in the former suit in some way deprived that judgment of its force and effect as res adjudicata.*" 171 U.S. at 207, 18 S.Ct. at 830 (emphasis added). In *Hubbell* there were two "proceedings subsequent to the judgment." First, the losing party moved for a new trial which was denied. *Id.* at 209, 18 S.Ct. at 830. Second, that party noticed an appeal but failed to perfect it; the appeal was not allowed.

*Id.* at 210, 18 S.Ct. at 831. Thus, the Supreme Court held, the lower court's prior judgment had not been deprived of its preclusive effect. *Id.* Significantly, the fact that the merits of the lower court's decision had not been reviewed by an appellate court did not dilute the preclusive effect of the judgment.

**7.** The *Quality Brands* court, it bears repeating, did not dismiss the appeal; it affirmed. But, as noted, I am indulging the majority's fiction that the court did not affirm. If, as the majority

decade earlier Mondakota Gas Company (Mondakota) had been sued, the district court had granted summary judgment against Mondakota on several issues and Mondakota had appealed. The Ninth Circuit dismissed the appeal without considering the merits because Mondakota failed to timely pay the filing fee. *Mondakota Gas Co. v. Montana–Dakota Util. Co.*, 194 F.2d 705 (9th Cir.1952) (per curiam). Thereafter, in *Parissi v. Telechron, Inc.*, 349 U.S. 46, 47, 75 S.Ct. 577, 99 L.Ed. 867 (1955) (per curiam), the Supreme Court held that the untimely payment of a filing fee did not affect the validity of the petitioner's appeal and added that it disapproved of the Ninth Circuit's decision in *Mondakota Gas.* In other words, Mondakota's appeal had been improperly dismissed. A decade later, in *Wight,* Mondakota attempted to relitigate issues identical to the ones it had lost on summary judgment in the earlier litigation and argued "that the doctrine of res judicata should not apply because that [earlier] case was never ruled on on its merits by an appellate court." *Wight,* 299 F.2d at 471. The district court rejected the argument and the Ninth Circuit affirmed, holding that "[t]he dismissal of the appeal from the judgment of the District Court ... did not operate to prevent that judgment from becoming final and from being res judicata." *Id.* at 477.

*Wight* relied on *United States v. Munsingwear, Inc.,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950). In *Munsingwear,* a price fixing case, the district court ruled against the government and the government appealed. While the appeal was pending, Munsingwear moved for dismissal because an intervening event had rendered moot the issue decided by the district court. The Eighth Circuit dismissed the appeal. Thereafter the district court held that its unreviewed judgment was res judicata as to the government. The government appealed, arguing that res judicata did not apply because there had

been no appellate review on the merits. The Eighth Circuit disagreed: "It is not conceivable to us that this refusal [to entertain an appeal in the prior case] had the effect of emasculating the judgment of the District Court which was appealed from, or of reserving the issue determined by that judgment for relitigation by the parties...." *United States v. Munsingwear, Inc.,* 178 F.2d 204, 209 (8th Cir.1949). The Supreme Court affirmed. The Court rejected the government's argument that *"res judicata* should not apply" to "those who have been prevented from obtaining the review to which they are entitled." *Munsingwear,* 340 U.S. at 39, 71 S.Ct. at 106. The Court held that the government should have moved to vacate the adverse district court judgment when the Eighth Circuit dismissed the appeal in the original litigation. *Id.* at 39–40, 71 S.Ct. at 106–07.

How do these decisions bear on our case? First, even assuming we refrained from reviewing the merits of the trial judge's decision in *Quality Brands,* his judgment should be accorded preclusive effect because *it was not vacated or otherwise modified.* Second, if the District believed that we did not review the merits of the district court judgment in *Quality Brands,* it should have moved to vacate that judgment. Third, vacatur likely would have been unwarranted because the District was responsible for any lack of appellate review, *see U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* —— U.S. ——, ——————, 115 S.Ct. 386, 391–93, 130 L.Ed.2d 233 (1994): the District's failure to press the statutory argument before the trial judge is what, according to the unpublished memorandum, caused us to demur on the constitutional issues. *Cf. supra* note 6 (discussing *Hubbell v. United States* ).[8]

## IV. CONCLUSION

I believe the majority errs as a matter of fact in finding that this Court did not adjudi-

reasons, we did not affirm and it is plain that we did not reverse or vacate, then under the majority's logic our *Quality Brands* disposition amounts to a dismissal of the appeal.

8. The District's failure to make the statutory argument before the district judge in *Quality Brands* may well have been a strategic maneuver. The District does not contend that it was un-

aware of the argument while it was defending the Storage Act in *Quality Brands.* In fact, on appeal in *Quality Brands* the District unsuccessfully tried to convince us that it had raised the argument below. *Quality Brands,* 1990 WL 51795, at *1. Why did the District not press the argument below? It appears that Councilman Ray was of the view that the Council (but not the

cate in *Quality Brands* the constitutional issues raised by the District again in this litigation. Moreover, the majority errs as a matter of law in concluding that the district court's unmodified judgment in *Quality Brands* does not have preclusive effect based on our purported failure to review the decision on the merits. Finally, the majority omits to consider the consequences of not applying collateral estoppel.[9] I respectfully dissent.

Board) should be able to exempt a wholesaler from any local warehousing requirement. *See* Appellant's Addendum 63, 67, 80. The Council, of course, could not exercise such power if Congress had in fact prohibited storage outside the District. Thus, it was in the Council's interest not to argue that Congress prohibited out-of-District storage but instead to seek a ruling that the District could require local warehousing without offending the Constitution.

9. The majority opinion raises a number of questions, not least among them how today's decision will affect Quality Brands, which has been operating a warehouse in Maryland (with the Board's permission) since 1979. It successfully challenged the Storage Act over six years ago (having filed for declaratory and injunctive relief on July 19, 1988) and relies on, as it is entitled to do, this Court's order affirming the injunction. It bears emphasizing that the law the majority today revives contains no grandfather provision for Quality Brands: under the terms of the Storage Act, Quality Brands had until July 27, 1988 (2 years after the effective date) to move its inventory back to the District. Appellee's Addendum 56–57; Brief of Amicus Curiae at 5.

Before today, if the District had attempted to force Quality Brands to use a warehouse in the District (*e.g.*, by threatening to revoke Quality Brands' license), the company could have moved to enforce the injunction. Res judicata plainly would have barred the District from collaterally challenging the injunction on the merits. *See Maggio v. Zeitz*, 333 U.S. 56, 68, 68 S.Ct. 401, 407, 92 L.Ed. 476 (1948); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4433, at 307 (1981) ("Preclusion ... prevents reexamination of the validity of a permanent injunction or similar order in subsequent contempt proceedings."); *id.* § 4414, at 117 n.21. If, after today, the District can enforce the Storage Act against Quality Brands, the majority will have allowed the District to wage a successful collateral attack on the judgment underlying the *Quality Brands* injunction. On the other hand, if Quality Brands is immune from today's decision upholding the Storage Act while Kronheim and all other wholesalers are not, the majority opinion will become a catalyst for the very inconsistency collateral estoppel is designed to prevent. *Montana v. United States*, 440 U.S. 147, 154, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (collateral estoppel "fosters reliance on judicial action by minimizing the possibility of inconsistent decisions"). The majority considers none of this.