*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-AA-0017

DC WINERY, LLC, T/A DISTRICT WINERY/ANA RESTAURANT & BAR, PETITIONER,

v.

D.C. ALCOHOLIC BEVERAGE CONTROL BOARD, RESPONDENT.

Petition for Review of an Order of the
District of Columbia Alcoholic Beverage Control Board
(20-CMP-000021)

(Argued March 1, 2023                    Decided August 10, 2023)

*Christopher L. LaFon*, with whom *Andrew J. Kline* was on the brief, for petitioner.

*Marcella Coburn*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia at the time the brief was filed, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General, were on the brief, for respondent.

Before BECKWITH and MCLEESE, *Associate Judges*, and STEADMAN, *Senior Judge*.

STEADMAN, *Senior Judge*:  By statute, the District of Columbia requires a licensee dealing in alcoholic beverages to store its inventory within the District. Petitioner DC Winery, which stored part of its inventory in Virginia, claims that this provision is unconstitutional as violative of the "dormant Commerce Clause" and is

not saved by § 2 of the Twenty-first Amendment ending prohibition. Twenty-five years ago, the D.C. Circuit rejected a dormant Commerce Clause challenge to this same law and upheld the law under § 2 of the Twenty-first Amendment. *Milton S. Kronheim & Co. v. District of Columbia*, 91 F.3d 193, 195-96 (D.C. Cir. 1996). Today, petitioner argues that recent Supreme Court precedent invalidates the D.C. Circuit's ruling and demonstrates that the District's storage requirement is unconstitutional. We disagree and hold that the statute passes constitutional muster.

## I. Background

### A. How the District Regulates Alcoholic Beverages

The District of Columbia Alcoholic Beverage Control Board[1] (the Board) enforces the District's alcohol laws. *See* D.C. Code § 25-201. These laws create a three-tier system of distribution that requires alcoholic beverage manufacturers,

---

[1] The D.C. Council recently enacted legislation changing the Board's name to the Alcoholic Beverage and Cannabis Board and the name of the administration which the Board oversees from the Alcoholic Beverage Regulation Administration (ABRA) to the Alcoholic Beverage and Cannabis Administration (ABCA). *See* The Medical Cannabis Amendment Act of 2022, D.C. Act 24-798, 70 D.C. Reg. 4303 (Apr. 14, 2023). This legislation does not affect the Board and ABRA's control over alcoholic beverages as is relevant to this case. For convenience, we retain the old names in the text of this opinion.

wholesalers, and retailers to obtain licenses to produce, store, or sell alcohol[2] at their establishments in the District. *See id.* §§ 25-102, -110 to -113. The Board oversees the Alcoholic Beverage Regulation Administration (ABRA), which helps the Board perform its functions. *Id.* § 25-202. These functions include issuing licenses; inspecting licensees' premises, books, and records; investigating violations of these laws; and punishing licensees for violations. *Id.* § 25-201(c).

D.C. Code § 25-754(b) states that "[a] licensee may not store alcoholic beverages upon premises outside the District." The Board may allow certain licensees to store alcohol on "premises other than the licensed establishment" if those premises are in the District. *Id.* § 25-754(a)-(b). Using an off-site storage facility requires obtaining a storage facility permit. 23 D.C.M.R. § 209.1. These facilities are subject to inspections by the Board and ABRA. *Id.* § 209.11; D.C. Code § 25-802(a). ABRA also must examine every licensed establishment's premises, books, and records at least once a year. D.C. Code § 25-802(b).

---

[2] Although D.C.'s alcohol laws define "alcoholic beverage" and "alcohol" as different terms, *see* D.C. Code § 25-101(4)-(5), in this opinion we refer to "alcoholic beverage[s]" as "alcohol" for brevity.

The only ways to import alcohol into the District for sale are via "a manufacturer's, wholesaler's,[3] or common carrier's license," or a "retailer's license under a validly issued import permit." *Id.* § 25-772(a). Import permits (also called importation permits) allow retailer licensees to import a narrow class of alcoholic beverages into the District. *Id.* § 25-119(a). Import permits only cover alcoholic beverages that a licensee cannot obtain "from a licensed manufacturer or wholesaler in the District in sufficient quantity to reasonably satisfy the immediate needs of the licensee." *Id.*

## B.  Facts

The facts are undisputed. Petitioner holds a retailer's license to sell, with an "endorsement" to manufacture, wine at 385 Water Street, SE, Washington, D.C.[4]

---

[3] When wholesalers import alcoholic beverages, they must deliver, unload, and store those beverages at their licensed premises in D.C. for at least four hours before they can ship or deliver the beverages to retailers. D.C. Code § 25-111(a-1). This rule is known as the "come to rest" or "coming to rest" requirement. The wholesaler also must record those beverages as inventory. *Id.*; *see* Board Op. 2019-074, *Advisory Opinion Clarifying the Storage Requirements of D.C. Licensed Wholesalers*.

[4] This license is an "on-premises retailer's license," which authorizes petitioner "to sell spirits, wine, and beer at the licensed establishment" for consumption there. D.C. Code § 25-113(a)(2)(A)(i). Petitioner also holds a "wine pub endorsement," which allows it to "manufacture wine . . . at one location from grapes, fruit, or fruit juices transported to the facility . . . for on-premises

Due to limited space at its D.C. location, petitioner stored large amounts of wine at a warehouse in Sterling, Virginia, called International Cellars. Wine was then shipped back to petitioner's D.C. property as needed. ABRA eventually learned that petitioner was storing wine across the Potomac and sent an investigative team to International Cellars with two agents from the Virginia Alcoholic Beverage Control Authority (ABC). The ABRA agents learned that, at the time of the visit, petitioner had approximately 168,000 bottles of wine stored there.

The Board issued petitioner a Notice of Status Hearing and Show Cause Hearing that alleged petitioner violated D.C. Code § 25-754(b) by storing wine outside the District. At the show cause hearing, petitioner did not dispute any facts or contend that it did not violate the statute. Instead, petitioner argued § 25-754(b) is unconstitutional under the dormant Commerce Clause and that § 2 of the Twenty-first Amendment does not save the statute. In a written order, the Board found that petitioner violated § 25-754(b), fined petitioner $1,500, ordered it to stop storing alcohol outside the District, and imposed other conditions on its license. In response to petitioner's constitutional argument, the Board denied that it had authority to invalidate the statute. Then, assuming arguendo that it had such authority, it

consumption and for sale to the licensed wholesalers for the purpose of resale to other licensees." *Id.* § 25-124(a).

concluded after an extensive analysis that the statute is valid under the Twenty-first Amendment and the dormant Commerce Clause.

## II. Analysis

The issue is whether requiring alcohol licensees to store their inventory in the District is constitutional under § 2 of the Twenty-first Amendment and the dormant Commerce Clause. We start by reviewing the relevant constitutional provisions and the case law interpreting them. Applying that case law to § 25-754(b), we conclude that the statute's in-District storage requirement is constitutional.

## A. Constitutional Framework

Section two of the Twenty-first Amendment prohibits "[t]he transportation or importation into any State,[5] Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof." U.S. Const. amend. XXI, § 2. As the Supreme Court recently explained, § 2 "allows each

---

[5] Of course, the District is not a state. That said, petitioner does not argue against the Twenty-first Amendment applying here. And we recognize that the D.C. Circuit has "treat[ed] the District of Columbia as a state for purposes of Twenty-first Amendment analysis." *Kronheim*, 91 F.3d at 201. Therefore, we proceed on that basis.

State leeway to enact the measures that its citizens believe are appropriate to address the public health and safety effects of alcohol use and to serve other legitimate interests." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2474 (2019). However, "§ 2 is not a license to impose all manner of protectionist restrictions on commerce in alcoholic beverages." *Id.* at 2457. Rather, we must view § 2 "as one part of a unified constitutional scheme." *Id.* at 2462. That scheme includes the dormant Commerce Clause. *See id.* at 2469-70.

The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States,[6] and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. This Clause "also 'contain[s] a further, negative command'" that "has come to be called the *dormant* Commerce Clause." *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1152 (2023) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). The dormant Commerce Clause "prohibits the enforcement of state laws 'driven by . . . economic protectionism—

---

[6] There may be some debate over whether the dormant Commerce Clause applies to laws, like § 25-754(b), that the D.C. Council passed and Congress declined to disapprove. *Compare Sprint Commc'ns Co. v. Kelly*, 642 A.2d 106, 114-18 (D.C. 1994) (per curiam) (applying the dormant Commerce Clause to such laws), *and Kronheim*, 91 F.3d at 198 (same), *with Am. Bus Ass'n, Inc. v. District of Columbia*, 2 A.3d 203, 213 n.19 (D.C. 2010) (questioning, without deciding, whether the dormant Commerce Clause applies to such laws). However, we need not reach this question because we hold that § 25-754(b) is valid under § 2 of the Twenty-first Amendment.

that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* at 1153 (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 337-38 (2008)). That type of discriminatory state law "can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose." *Tenn. Wine*, 139 S. Ct. at 2461 (internal quotation marks and alterations omitted). In other words, the law must "advance[] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 278 (1988)).

When a state law governing alcohol discriminates against out-of-state economic interests, § 2 of the Twenty-first Amendment compels "a different inquiry." *Tenn. Wine*, 139 S. Ct. at 2474. First, we assess if the law discriminates against out-of-state economic interests. *Id.*; *see B-21 Wines, Inc. v. Bauer*, 36 F.4th 214, 222 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 567 (2023). If not, the law is constitutional. *Tenn. Wine*, 139 S. Ct. at 2474. If the alcohol law does discriminate against out-of-state economic interests, it survives constitutional scrutiny if it "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.*

**B. Application to § 25-754(b)**

Section 25-754(b) survives constitutional scrutiny under *Tennessee Wine*. We review this constitutional challenge to a statute de novo. *District of Columbia v. Towers*, 260 A.3d 690, 693 (D.C. 2021). Although § 25-754(b)'s in-District storage requirement discriminates to some degree against interstate commerce,[7] legitimate nonprotectionist grounds justify it. The parties agree that the statute aids ABRA in inspecting alcohol storage facilities and enforcing the District's alcohol laws. Below, we review how § 25-754(b) promotes those nonprotectionist objectives. We then address whether nondiscriminatory alternatives to § 25-754(b) could readily achieve the District's inspection and enforcement goals such that the statute's discrimination against interstate commerce is not justified.

---

[7] The parties do not contest this point. "In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (internal quotation marks and citation omitted). Section 25-754(b) treats storage facilities inside the District differently from facilities outside the District by allowing the former, but not the latter, to store alcohol for D.C. licensees and benefit from that business. Therefore, the statute discriminates against interstate commerce.

### 1. Legitimate Nonprotectionist Grounds

A state alcohol law can permissibly discriminate against interstate commerce if the law can be justified on legitimate nonprotectionist grounds. *Tenn. Wine*, 139 S. Ct. at 2474-76. The law's connection to those nonprotectionist grounds cannot rely on "mere speculation" or "unsupported assertions." *Id.* (quoting *Granholm v. Heald*, 544 U.S. 460, 490, 492 (2005)). We will therefore not uphold a discriminatory law if "the record is devoid of any 'concrete evidence' showing" that the law promotes legitimate nonprotectionist interests. *Id.* (quoting *Granholm*, 544 U.S. at 490). Further, a law will not stand if it was passed for "purely protectionist purposes" or if its "predominant effect . . . is protectionism." *Id.* at 2469, 2474. In *Tennessee Wine*, the Court invalidated a law that required applicants for liquor store licenses to live in-state for at least two years before applying. *Id.* at 2474-75. The law facially discriminated against nonresidents and "ha[d] at best a highly attenuated relationship" to nonprotectionist interests—in that case, public health and safety. *Id.* at 2474. For starters, the record lacked evidence linking the residency requirement to public health and safety because the State did not defend the requirement on health and safety grounds until the case reached the Supreme Court. *Id.* at 2474-75. The Court readily dismissed the State's nonprotectionist arguments. For example, the residency requirement was not necessary to help the State oversee liquor store

operators "since the stores at issue are physically located within the State" such that "the State can monitor the stores' operations through on-site inspections, audits, and the like." *Id.* at 2475. In short, the law was unconstitutional because its predominant effect was protecting in-state interests from out-of-state competition, not promoting the nonprotectionist interests of public health and safety. *Id.* at 2476.

Here, legitimate nonprotectionist interests underpin § 25-754(b), as the record indicates. When the D.C. Circuit heard a dormant Commerce Clause challenge to § 25-754(b)'s predecessor in 1996, that court explained that the law "both by its terms and according to its history is designed to advance the core enforcement purposes protected by [§] 2 of the Twenty-first Amendment." *Kronheim*, 91 F.3d at 203. In upholding the law, the court recognized that "D.C.'s claimed motives of 'legitimate state interests which would be promoted by requiring geographic proximity of warehouses, *e.g.*, auditing company records, monitoring compliance with the ABC laws, monitoring licenses, checking tax forms for audits, etc.,' [] falls squarely within the state's core enforcement powers over alcohol." *Id.* at 203-04 (citation omitted) (quoting *Quality Brands, Inc. v. Barry*, 715 F. Supp. 1138, 1141 (D.D.C. 1989)). Admittedly, the statute's legislative history shows some potentially protectionist purposes behind § 25-754(b). *See Kronheim*, 91 F.3d at 203. Yet

§ 25-754(b)'s purpose and effect are not "purely protectionist" given the statute's firm ties to the District's inspection and enforcement interests.

Section 25-754(b) clearly facilitates the District's broad inspection and enforcement goals for alcohol storage. In addition to those addressed in *Kronheim*, the District identifies other ways in which limiting alcohol storage to D.C. enables ABRA to effectively execute its statutory responsibilities related to public health and safety. For example, in-person inspections can detect and deter violations of laws against bottle tampering, *see* D.C. Code § 25-833(a), and the unlawful consumption of alcohol at storage facilities, *see id.* § 25-754(c), as well as a storage facility's compliance with security requirements, limits on outside activity, and proper display of warning signs, *see* 23 D.C.M.R. §§ 209.3-.11. The Board's order's point-by-point explanation of how ABRA's inspection authority detects and deters violations of these and related regulations exceeds "mere speculation or unsupported assertions." *Tenn. Wine*, 139 S. Ct. at 2474 (internal quotation marks omitted). Indeed, *Tennessee Wine*'s observation that when liquor stores "are physically located within the State[,] . . . the State can monitor the stores' operations through on-site inspections, audits, and the like" rings true for alcohol storage facilities too. *Id.* at 2475. This monitoring "'provides strong incentives not to [store] alcohol' in a way that threatens public health or safety." *Id.* (quoting *Granholm*, 544 U.S. at 490).

Therefore, the in-District storage requirement's "predominant effect" is not protectionism, but promoting the proper supervision of alcohol in the District by enabling ABRA to effectively inspect alcohol storage facilities and enforce the law. The totality of nonprotectionist grounds clearly justifies § 25-754(b) under § 2 of the Twenty-first Amendment and, as explained below, petitioner's proposed alternatives for storing alcohol outside D.C. do not alter that conclusion.

## 2. Nondiscriminatory Alternatives

Petitioner's primary argument against § 25-754(b)'s constitutionality is that nondiscriminatory alternatives to the statute could achieve the District's inspection and enforcement objectives. In other words, petitioner argues that § 25-754(b) is not justified because the District could meet its inspection and enforcement goals even if alcohol was stored outside D.C.

Relevant to the § 2 inquiry is whether the State's nonprotectionist "objective[s] could . . . easily be achieved by ready alternatives." *Tenn. Wine*, 139 S. Ct. at 2475. Notably, unlike the dormant Commerce Clause analysis, the § 2 analysis does not demand that *no* reasonable nondiscriminatory alternatives exist, since § 2 "allows each State leeway to enact the measures that its citizens believe

are appropriate to address the public health and safety effects of alcohol use and to serve other legitimate interests." *Id.* at 2474. *Compare Davis*, 553 U.S. at 338 (explaining that under the dormant Commerce Clause, "[a] discriminatory law . . . will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives") (internal quotation marks and citations omitted), *with B-21 Wines*, 36 F.4th at 224 (acknowledging that *Tennessee Wine* "conducted a limited inquiry into the possible existence of nondiscriminatory alternatives" but ultimately, "that inquiry was not central to the *Tennessee Wine* analysis"). Rather, § 2 triggers a "different inquiry." *Tenn. Wine*, 139 S. Ct. at 2474. Thus, the existence of nondiscriminatory alternatives is a useful, but not dispositive, tool for assessing whether the law "can be justified as a public health or safety measure or on some other legitimate nonprotectionist ground." *Id.*

Here, the Board's order analyzed petitioner's three proposed alternatives and explained that they are either impractical or imprecise for addressing the problems that § 25-754(b) addresses. We review the Board's order de novo because where, as here, "the agency's final decision rests on a question of law, the reviewing court has the greater expertise, and the agency decision is therefore accorded less deference." *Economides v. D.C. Bd. of Zoning Adjustment*, 954 A.2d 427, 433 (D.C. 2008) (internal quotation marks and citation omitted). Whether, and to what degree,

we should defer to the Board's conclusions is a matter we need not address. The Board had extensive experience in inspecting alcohol licensees and enforcing the District's alcohol scheme. It thoroughly explained each proposed alternative's faults. In reviewing the order, we see no reason to question the Board's assessment of these alternatives.

Petitioner's first alternative is allowing storage in nearby counties in Virginia and Maryland, which would keep storage facilities within driving distance of the District to facilitate inspections and enforcement. However, the Board correctly noted that ABRA lacks authority to perform at-will inspections at and seize evidence from facilities outside D.C. ABRA and its inspection authority derive from statutes passed by the D.C. Council. *See* D.C. Code §§ 25-202, -201(c)(4). Any statute the Council passes must be "restricted in its application exclusively in or to the District." *Id.* § 1-206.02(a)(3). Thus, ABRA has authority to conduct inspections in the District but not outside it. Absent that authority, the Board explained, "ABRA cannot guarantee that other states or unlicensed third parties will voluntarily cooperate with investigations, permit inspections, or permit the seizure of evidence" outside D.C. In theory, ABRA could partner with its counterparts in other jurisdictions to conduct inspections (like it did here with Virginia's ABC). But in practice, doing so would hamper ABRA's ability to "[r]egularly conduct inspections

of the premises and the books and records of all licensees" and ensure "compliance with the requirements" of the District's alcohol laws. *Id.* § 25-201(c)(4). Having to coordinate with a neighboring State's agency could impede ABRA's ability to make the quick unannounced visits that advance § 25-754(b)'s deterrence goals. Thus, the District's inspection and enforcement objectives "could not easily be achieved by" permitting storage in a limited geographic area outside D.C. *Tenn. Wine*, 139 S. Ct. at 2475.

Second, petitioner argues that existing laws and regulations governing how alcohol is imported into D.C. demonstrate that alcohol can be safely delivered to D.C. retailers from storage facilities that are not subject to ABRA's oversight. Specifically, petitioner relies on import permits, which allow D.C. retailers to directly import alcohol without using a D.C.-based manufacturer or wholesaler, *see* D.C. Code § 25-119, and the "come to rest" rule, which requires wholesalers to unload and store imported alcohol at their licensed premises for at least four hours before delivering that alcohol to D.C. retailers, *see id.* § 25-111(a-1); Board Op. 2019-074, *Advisory Opinion Clarifying the Storage Requirements of D.C. Licensed Wholesalers*. In its order, the Board responded that import permits only address "converting" outside alcohol into alcohol that can be sold in D.C., whereas the in-District storage requirement enables ABRA to inspect that alcohol after it arrives to

a retailer. As for the come-to-rest rule, it only applies to wholesalers and alcohol moving through the supply chain, not to retailers who handle alcohol at the end of the supply chain when it reaches the consumer. In short, import permits and the come-to-rest rule only ensure that alcohol arrives to retailers in D.C. Section 25-754(b) covers what happens after the alcohol arrives and facilitates ABRA's inspection of it. These inspections, in turn, further the District's public health and safety goals as explained above. Therefore, these existing laws are not a viable alternative to § 25-754(b).

Petitioner's final alternative is using tracking technology to monitor alcohol stored outside D.C. According to petitioner, this technology "can detect details down to the exact location of bottles within a shipment and the angle at which wine bottles are being stored, both during storage and in transit." The Board's order explained that this idea is, at best, impractical. Petitioner does not explain who would pay for this technology, how much it would cost, or whether the technology could effectively monitor alcohol on such a large scale. There is also a question of how to ensure that licensees honestly record their inventory using the technology. As petitioner describes it, this technology can only monitor alcohol that is registered with the technology. Licensees could therefore easily evade the technology by registering only part of their inventory. Only an in-person inspection could detect

whether a licensee was storing more alcohol than it registered with the technology and whether that storage complied with D.C. law. Section 25-754(b) makes those types of inspections possible by keeping storage facilities in the District.

At bottom, petitioner's proposed alternatives are too impractical or imprecise to overcome § 25-754(b)'s nonprotectionist justifications for discriminating against interstate commerce. *See Tenn. Wine*, 139 S. Ct. at 2475-76. The in-District storage requirement is constitutional under § 2 of the Twenty-first Amendment.

## III.    Conclusion

Accordingly, the order of the Board must be and is hereby

*Affirmed*.